USCA1 Opinion

 

 United States Court of Appeals  For the First Circuit ____________________ No. 96-1837 EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff, Appellant, v. AMEGO, INC., Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT  FOR THE DISTRICT OF MASSACHUSETTS [Hon. George A. O'Toole, Jr., U.S. District Judge] ___________________ ____________________ Before Cyr and Lynch, Circuit Judges,  ______________ and McAuliffe,* District Judge. ______________ ____________________ Karen M. Moran, Attorney, Equal Employment Opportunity __________________ Commission, with whom C. Gregory Stewart, General Counsel, Gwendolyn __________________ _________ Young Reams, Associate General Counsel, and Vincent J. Blackwood, ____________ _____________________ Assistant General Counsel, were on brief, for appellant. Mary Jo Hollender, with whom Hollender & Carey, L.L.P., was on __________________ brief, for appellee. ____________________ April 7, 1997 ____________________ *Of the District of New Hampshire, sitting by designation. LYNCH, Circuit Judge. Amego, Inc., is a small not- LYNCH, Circuit Judge. _____________ for-profit organization which cares for severely disabled people suffering from autism, retardation, and behavioral disorders. It serves twenty-five to thirty clients, including six in a residential program in Mansfield, Massachusetts, where Ann Marie Guglielmi was employed as a Team Leader. The Team Leader position required her to be responsible for the care of these disabled clients, including the responsibility of administering vital medications to them. After an unresolved investigation of improprieties in the administering of medication to patients at a related facility, Amego learned that other staff felt Guglielmi was not performing her job adequately and was putting patients at risk. Amego also learned that Ms. Guglielmi had twice attempted to commit suicide within the previous six weeks by overdosing on medications. This, Amego decided, meant that Guglielmi could not safely dispense medications, an essential job function, and that there was no other job reasonably available to her. Her employment was thus terminated.  The Equal Employment Opportunity Commission ("EEOC") sued Amego on behalf of Guglielmi under the Americans with Disabilities Act ("ADA"), 42 U.S.C. 12101 et __ seq. The district court entered summary judgment against the ____ EEOC, holding that the EEOC had not made out a prima facie case that Guglielmi was an otherwise "qualified" individual, -2- 2 that an accommodation could be reasonably made, and that there was discrimination "because of" her disability.  The EEOC appeals and argues that the question of whether an employee poses a significant risk to other individuals in the workplace is an affirmative defense on which the employer bears the burden of proof and is thus not part of the plaintiff's burden that the employee is qualified. Those issues of qualification and risk, the EEOC says, are matters for the jury to resolve at trial and may not be resolved on summary judgment. The EEOC also invites this court to hold that "adverse employment action taken because of conduct related to a disability is tantamount to action taken because of a disability itself" for purposes of the ADA.  We affirm the judgment of the district court. I. The following facts are undisputed. Founded in 1972 by parents of autistic individuals, Amego receives public funding and is licensed by two state agencies. A condition of licensing is that Amego provide conditions that ensure the safety and well-being of its clients. Amego maintains a very low client-to-staff ratio, usually one staff member to two clients. One particularly aggressive client required supervision by three staff members, eighteen hours a day.  -3- 3 Amego has a policy of not rejecting those who seek its help. Most of its clients engage in aggressive and self- injuring behavior, including self-mutilation. Many have been rejected by, or discharged from, other agencies. Most clients are on prescription medications, and in June of 1992, all clients at the Mansfield residence, save one, were receiving prescription medications.  Consistent with its philosophy of attempted integration, Amego provides its clients with access to community activities on a regular basis. Residential clients are transported daily to the Day Treatment Program, where they frequently are taken by direct care staff to stores, bowling alleys, banks, and the like.  In September 1990, Amego hired Guglielmi as a Behavior Therapist. She was then about 21 years old and did not represent herself to have any disability. In January 1991, she was diagnosed as bulimic and clinically depressed; however, she did not tell her employer about these conditions until after her first suicide attempt, over a year after the diagnosis. She was prescribed Prozac in 1991, but it only partially alleviated the depression. She stopped taking the drug in April. In the fall of 1991, she started living with her boyfriend, David Andrade, who worked at a different Amego residence. That relationship was fraught with problems. Andrade used cocaine; Guglielmi, however, says she did not -4- 4 confirm her suspicions of that until late June 1992. In early 1992, she started seeing a social worker, Margaret Posever, for bimonthly therapy sessions.  Earlier, in July 1991, Guglielmi was promoted to the position of Team Leader at the Mansfield residence. The essential functions of that position included: supervising the day-to-day implementation of individual clinical, educational, and vocational programs and data collection for all programs; serving as a role model for staff in all areas of client programming, client services, and professional practice; assessing staff performance, providing additional training, support, and counseling as appropriate; ensuring that Amego's policies and procedures on clients' rights were implemented and documented; responding appropriately in crisis situations; and administering and documenting the use of prescribed medications. On March 4, 1992, Guglielmi received a performance evaluation which said she was an "exceptional" Team Leader. The evaluation was based on her performance through January 1992. In the spring of 1992, Guglielmi applied for promotion to the position of Program Coordinator for the Mansfield residence. The promotion instead went to Kristen Stone. Stone assumed her new responsibilities on May 4, 1992. That same day, Guglielmi deliberately took an overdose of nonprescription sleeping pills which she had -5- 5 purchased for that purpose. After taking the pills, she told Andrade what she had done; he took her to the emergency room. She was transferred to a psychiatric hospital and released later that evening. She told health care workers that she attempted suicide because she was upset by problems in her relationship with her boyfriend, her failure to receive the promotion, and other work-related stress. She was readmitted to the psychiatric hospital on May 6, 1992, and stayed there until May 12 because of concerns about her safety. On the day of her readmission to the hospital -- two days after her suicide attempt -- Guglielmi was not able to "contract for safety" with her therapist Posever. Guglielmi told Posever that even if she were to so contract, her mood was in such flux that she could not be sure she would not hurt herself anyway. A week after returning to work, and again two weeks later, she told Posever that she felt suicidal. When Guglielmi returned to work on May 13, she told her supervisor only that she had been hospitalized for bulimia and depression. She did not say that she had attempted suicide. She asked her supervisor to modify her work schedule so that she could attend therapy twice or thrice weekly. Her supervisor agreed to this accommodation. However, Guglielmi stopped going to the therapy sessions after a few weeks.  -6- 6 On May 21, 1992, Guglielmi began seeing Dr. Kenneth Levin for psychopharmacological treatment. He diagnosed her as suffering from bulimia and major depression, prescribed Prozac and trazodone, and saw her to monitor her use of medication. Prozac was one of the medications regularly administered to Amego's clients. On June 4, 1992, she told Dr. Levin that she had experienced periodic feelings of increased depression, including a period when she contemplated overdosing. She assured Dr. Levin that if such thoughts recurred, she would not act on them but would inform her boyfriend or a health care provider. She did not keep her word. On June 13, Guglielmi deliberately overdosed again, this time using her prescription medications, Prozac and trazadone, as well as aspirin. After taking the overdose, she called the Plainville police, who took her to the hospital. She was released on June 15, 1992. She told her health care providers that she was not really depressed when she overdosed but wanted to provoke a reaction from her boyfriend. When Guglielmi returned to work on June 17, she again did not tell her employer that she had attempted suicide.  On the day Guglielmi returned to work, the Executive Director of Amego, Caryn Driscoll, and the Director of Administrative Services, Karen Seal, met with David -7- 7 Andrade about his job performance problems. During this meeting, Andrade mentioned rumors that clients were being drugged at the Fales Road residence. He worked at that location regularly, and Guglielmi worked there occasionally. Around that time, Driscoll learned that Klonopin, one of the medications prescribed for clients, was either missing or was being used at an accelerated rate at the Fales Road residence. Some cocaine users take Klonopin as an antidote, to calm them down from the effects of cocaine.  Amego investigated and found that four of the clients at the Fales Road residence (two of whom should not have had Klonopin at all) had blood levels of Klonopin which were too high. Amego asked any employees who had pertinent information to step forward. Guglielmi did so and was interviewed on June 26 by Driscoll, Amego's Human Rights Officer, and a private investigator. During the interview, Guglielmi focused on her relationship with Andrade, who she feared might be targeted in the investigation. She said that she was suffering from bulimia and depression and revealed for the first time her two recent suicide attempts. In an attempt to explain Andrade's performance issues, she said that he had helped her when she attempted suicide two times -8- 8 by overdosing on both prescription and over-the-counter drugs.1  Earlier, on June 5, a shift supervisor at the Mansfield residence, Chester Millet, had noticed that the medication log was missing. He conducted a thorough search, including behind the medication cabinet, and did not find it. Guglielmi also helped look for it. On the same day of her interview with Driscoll, June 26, Guglielmi reported that she had found the missing medication log. She said the log had been behind the medication cabinet, between the cabinet and the wall. Millet told Driscoll that he had previously looked there and had not seen it. Although Driscoll did not initially consider Guglielmi under suspicion for the improper drugging of patients at Fales Road, she and other staff members found the discovery of the book by Guglielmi to be peculiar. A review of the medication log showed that the supply of drugs on hand at the Mansfield residence was excessive. It was not possible to determine from the log whether medications were missing.  On June 26, Driscoll spoke with the Plainville police about her concerns about the drugging of patients at  ____________________ 1. During the interview, Guglielmi was asked whether she had observed or suspected that Andrade was using cocaine. She answered "no" to both questions. The latter answer was not true. Discovery in this case revealed that she had spoken to her therapist about her suspicions of her boyfriend's cocaine use as early as May 27, 1992.  -9- 9 Fales Road. The police told Driscoll that they found pills, initially thought to be Klonopin, in Guglielmi's apartment on the night they responded to her suicide call.  Around June 28, Driscoll received a call from Carlos Andrade, an Amego employee and David Andrade's brother. He told her that staff members felt Guglielmi's job performance was suffering and had asked him to do something about it. He reported that staff members were uncomfortable with her job performance, that she was erratic in behavior, had mood swings, seemed to be focussed on her personal problems, that she was seen walking outside and crying, that she was heard fighting on the phone with David Andrade, and that she was self-absorbed and unable to concentrate on her job.  Carlos Andrade also passed on that Millet, the shift supervisor and one of the most senior staff members at the Mansfield residence, was concerned that Guglielmi had suddenly handed him the drug log, saying that she had found it in the residence when he had searched everywhere for it. Driscoll confirmed Carlos Andrade's report with Millet, who had never before complained about another employee. Carlos Andrade felt that Guglielmi was not performing her job safely and was putting clients at risk. Driscoll knew there was no way to prevent Guglielmi from having access to medication while she worked at Amego.  -10- 10 A few days later, on July 1, Driscoll informed Guglielmi in writing that she was temporarily removed from her position as Team Leader and would be reassigned to perform clerical and other light duties. The letter stated that the fact that Guglielmi's recent hospitalizations were the result of deliberate overdoses of prescription medications raised "concerns about [her] ability to perform [her] present job functions including medication ordering, dispensing and shift supervision." The letter also indicated that Amego's Safety Committee would meet to determine whether Guglielmi could perform her job, or another available job, with or without accommodations. Driscoll said that the Committee should seek medical information from Guglielmi's treating physician. In an attempt to obtain a professional opinion on Guglielmi's ability to resume her duties, Driscoll sent a letter to Posever on July 1 asking whether Guglielmi could perform eleven duties that a Team Leader would need to perform, set forth on a checklist. The letter came back to Amego on July 8 with a check in the "yes" column for each job duty. Only Guglielmi had signed the bottom of the checklist. Driscoll called Posever to ask if the checklist accurately reflected Posever's opinion that Guglielmi could complete the duties or whether the list merely reflected Guglielmi's own opinion. Posever told Driscoll she was not a -11- 11 medical doctor, that the checklist did not represent a medical competency evaluation as to each specific job duty, nor was it a guarantee regarding each duty. It was rather that, based on her discussions with Guglielmi and her knowledge of her work and treatment history, Posever had no reason to think Guglielmi could not perform those duties. Posever's checking "yes" was based on her observations of Guglielmi's demeanor and on Guglielmi's statement that she felt comfortable giving out psychotropic medications at work, even in light of her suicide attempts. Driscoll appeared dissatisfied with the response and pressed for a more definitive opinion, which Posever declined to give. Later, Driscoll told Guglielmi that Posever's response was inadequate.  On July 22, Driscoll sent Dr. Levin a letter requesting his opinion as to whether Guglielmi could perform the eleven functions of her job and enclosing the checklist. In a letter dated July 27, 1992, Dr. Levin wrote that Guglielmi was no longer on prescription medication. He concluded: "My understanding is that she has consistently performed her regular job responsibilities conscientiously and I see no difficulty with her returning to her regular position." There was no checklist with the letter Amego received. Driscoll viewed Dr. Levin's conclusions as largely being based on what Guglielmi said she could do and -12- 12 her representation that she had no performance problems. But Driscoll knew from staff complaints that Guglielmi had a range of performance problems. And Driscoll knew Dr. Levin had not checked with anyone at Amego about whether Guglielmi was in fact performing well. Driscoll told Guglielmi that Dr. Levin's letter did not adequately deal with the job functions issue.  Driscoll was also concerned that the parents of Amego's charges would feel that their children would be put at risk by being in the care of someone who abused prescription drugs. The parents, she felt, would contact one of the state agencies which licensed Amego.  On July 21, the Safety Committee met. The Committee was comprised of four administrators: Seal, the Director of Administrative Services; Amego's Health Coordinator, who was a nurse; the Staff Development Coordinator; and the Administrative Assistant/Workers' Compensation Coordinator. The Committee found that Guglielmi was not in fact performing her job duties conscientiously or performing them well. The Committee concluded that Guglielmi could not safely perform the Team Leader position and that there was no Amego position that could be modified to accommodate her. On July 27, 1992, Amego's Board of Directors was informed of the recommendation of the Safety Committee and, -13- 13 after additional discussion, concluded that there was no alternative position that could accommodate Guglielmi. The following day Driscoll informed Guglielmi that her employment was terminated. Amego says its core concern was that Guglielmi could not meet the essential job function of handling prescription medication.  II. The district court entered summary judgment for Amego, finding that the EEOC had failed to meet its burden under the ADA of showing that Guglielmi was qualified for the position of Team Leader and that Amego could have made a reasonable accommodation. The district court also found that the EEOC had failed to meet its burden of showing that Amego had discriminated against Guglielmi "because of" a disability.  The scope of appellate review of entry of summary judgment in ADA cases, as in all others, is de novo. Soileau __ ____ _______ v. Guilford, 105 F.3d 12, 14 (1st Cir. 1997). The EEOC bore ________ the burden of showing that Guglielmi was qualified to perform, either with or without reasonable accommodation, the essential functions of her job. See Jacques v. Clean-Up ___ _______ ________ Group, Inc., 96 F.3d 506, 511 (1st Cir. 1996).2 ___________  ____________________ 2. To establish a claim under the ADA, a plaintiff must prove by a preponderance of the evidence: (1) that she was disabled within the meaning of the ADA; (2) that, with or without reasonable accommodation, she was able to perform the essential functions of her job (in other words, that she was -14- 14 For summary judgment purposes, the parties do not dispute that Guglielmi was a disabled person within the meaning of the ADA. It is also undisputed that an essential function of the Team Leader position is to administer and monitor the medication of Amego's clients. The written job description provides that this is an essential job function, and the EEOC concedes that Team Leaders have access to locked medicine cabinets containing large quantities of drugs and are expected to administer medications to clients. This case initially turns on whether the EEOC has met its burden of showing that Guglielmi was a "qualified" person. Amego's position is that it terminated Guglielmi's employment because she showed by her conduct -- by behavior leading co-workers to have concerns about whether she was a risk to clients and by her two attempts to commit suicide using prescription and non-prescription drugs -- that she could not reasonably be trusted to meet her responsibilities as to medications. Although the qualification analysis could be understood to subsume the concept of reasonable accommodation, we think it analytically sounder to treat the  ____________________ "qualified"); and (3) that the employer discharged her in whole or in part because of her disability. See Jacques, 96 ___ _______ F.3d at 511; Katz v. City Metal Co., Inc., 87 F.3d 26, 30 ____ ____________________ (1st Cir. 1996); see also 42 U.S.C. 12112(a). The district ___ ____ court used the largely similar formula under McDonnell _________ Douglas Corp. v. Green, 411 U.S. 792 (1973), for establishing _____________ _____ a prima facie case of discrimination. Either formula is appropriate here. See Katz, 87 F.3d at 30. ___ ____ -15- 15 two topics separately. Cf. Southeastern Community College v. ___ ______________________________ Davis, 442 U.S. 397, 406 (1979)("An otherwise qualified _____ person [under the Rehabilitation Act] is one who is able to meet all of a program's requirements in spite of his handicap.").3 Qualification/Direct Threat Under Title I of the ADA ____________________________________________________ To understand the EEOC's burden of proof argument, it is necessary to understand the ADA statutory scheme. At its core, Title I of the ADA is about protecting the disabled from discriminatory employment action based on stereotypes and fear. See H.R. Rep. No. 101-485, pt. 3, at 45 (1990), ___ reprinted in 1990 U.S.C.C.A.N. 445, 468; see also Jacques, 96 _________ __ ___ ____ _______ F.3d at 511. The prima facie case establishes that because an individual with a disability is qualified, yet has suffered adverse employment action because of that disability, the employer may have engaged in the type of discrimination the ADA is designed to prevent. Here, the plaintiff has failed to establish a prima facie case: there is no evidence suggesting the presence of any disability- based discrimination.  The general rule of the ADA is that an employer shall not "discriminate against a qualified individual with a disability because of the disability . . . ." 42 U.S.C.   ____________________ 3. As explained below, caselaw interpreting the Rehabilitation Act of 1973 is applicable to the ADA. See 29 ___ U.S.C. 794(d). -16- 16 12112(a). It is generally accepted that, in a Title I case, the plaintiff bears the burden of showing she is a "qualified" individual. See Jacques, 96 F.3d at 511.  ___ _______ A qualified individual is one who can perform the essential functions of the job held. See 29 C.F.R.  ___ 1630.2(m). The statute also says that "the term 'qualification standards' may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C.  12113(b). It defines "direct threat" as meaning "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. 12111(3). The rub is that the language about "qualification standards" under Title I appears in a section of the statute entitled "Defenses." 42 U.S.C. 12113(a) ("It may be a defense to a charge of discrimination under [the ADA] that an alleged application of qualification standards . . . has been shown to be job-related.") The EEOC argues that the employer bears the burden of proof on this affirmative defense.  The EEOC argues further that whenever an issue of threats to the safety or health of others is involved in a Title I case, it must be analyzed under the "direct threat" provision of 12113(b) as an affirmative defense. Specifically, the EEOC contends that the 12113(b) provision -17- 17 that qualification standards may include a requirement that an individual not be a direct threat is to be read in the context of the defense set out in 12113(a). The EEOC supports its position by noting that 12113 is captioned "Defenses."4 Thus, the EEOC says, the district court erred in considering the matter of whether Guglielmi posed a threat to the safety of Amego's clients as a matter of "qualification," on which plaintiff bears the burden. Amego contends that the risks posed to others may be considered as part of the qualified individual analysis, and that the specific discussion of a direct threat defense in 12113  ____________________ 4. The confusion on this point is reflected in the legislative history. During congressional hearings, Representative Dannemeyer asked a witness, who had contributed to the drafting of the ADA, who had the burden of proof on the direct threat issue in the communicable disease context. Comm. on Educ. and Labor, U.S. House of Representatives, 101 Cong., 1st Sess., The Americans with ___________________ Disabilities Act 1896 (Comm. Print 1990). The witness _________________ replied that the plaintiff, as part of his prima facie case, would have to put on evidence that his communicable disease would not pose a direct threat to others. Id. ___ There is also caselaw establishing that even under a "direct threat" analysis, the "employee retains at all times the burden of persuading the jury either that he was not a direct threat or that reasonable accommodations were available." Moses v. American Nonwovens, Inc., 97 F.3d 446, _____ ________________________ 447 (11th Cir. 1996)(per curiam)(citing Benson v. Northwest ______ _________ Airlines, Inc., 62 F.3d 1108, 1112 (8th Cir. 1995)), cert. ______________ _____ denied, 117 S. Ct. 964 (1997). In affirming summary judgment ______ for the employer in an ADA action brought by an epileptic product inspector who worked near exposed machinery, the Moses court noted that to defeat summary judgment, the _____ nonmoving party must raise "significant probative evidence" that is "sufficient" for the jury "to return a verdict for that party." Id. at 447 (citing Anderson v. Liberty Lobby, ___ ________ ______________ Inc., 477 U.S. 242, 249 (1986)). ____ -18- 18 does not preclude the consideration of safety risks in other prongs of the ADA analysis.  Because the statutory scheme does not clearly resolve this debate, we look to the legislative history to determine whether risks posed to others may only be considered in the direct threat defense context. See United ___ ______ States v. Charter Int'l Oil Co., 83 F.3d 510, 517 (1st Cir. ______ ______________________ 1996). Upon such review, we discern no congressional intent to preclude the consideration of essential job functions that implicate the safety of others as part of the "qualifications" analysis, particularly where the essential functions of a job involve the care of others unable to care for themselves. The House Report5 said that, in the definition of "direct threat," "[t]he Committee intends to codify the direct threat standard used by the Supreme Court in School Board of Nassau County v. Arline." H.R. Rep. No. _____________________________ ______ 101-485, pt. 3, at 34 (1990), 1990 U.S.C.C.A.N. at 457. The House Report goes on to say that, "[i]f the applicant is otherwise qualified for the job, he or she cannot be disqualified on the basis of a physical or mental condition  ____________________ 5. The report was concerned about exclusion of individuals based on fears or stereotypes, rather than on "objective" evidence about the individual involved. Thus, in the case of a person with mental illness there must be objective evidence from the person's behavior that the person has a recent history of committing overt acts or making threats which cause harm or which directly threatened harm. H.R. Rep. 101- 485, pt. 3, at 45-46, 1990 U.S.C.C.A.N. at 468-69. -19- 19 unless the employer can demonstrate that the applicant's disability poses a direct threat to others in the workplace. . . . The plaintiff is not required to prove that he or she poses no risk." Id. at 46, 1990 U.S.C.C.A.N. at 469. The ___ intent to codify Arline suggests that the burden is on ______ plaintiff to show that he or she is qualified in the sense of not posing a direct threat. Arline considered that issue to ______ be part of the "qualification" analysis under 504 as to which plaintiff bears the burden.6 See Arline, 480 U.S. at ___ ______ 287-88. The ADA also contains a directive that it be enforced in a manner that is consistent with the requirements of the Rehabilitation Act of 1973. 42 U.S.C. 12117(b). Courts therefore use caselaw under 504 of the Rehabilitation Act, 29 U.S.C. 794, for guidance in interpreting the ADA. See 29 U.S.C. 794(d)("The standards ___ used to determine whether this section [ 504 of the Rehabilitation Act] has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under Title I of the [ADA]."); Katz v. City ____ ____ Metal Co., Inc., 87 F.3d 26, 31 n.4 (1st Cir. 1996) (Section ________________ 504 of the Rehabilitation Act "is interpreted substantially  ____________________ 6. While the language of the "direct threat" provision is not limited to instances where the threat comes from communicable diseases, the provision originated in the communicable disease context. See H.R. Rep. No. 101-485, pt. ___ 2, at 76, 1990 U.S.C.C.A.N. at 358-59. -20- 20 identically to the ADA."). Under 504, it is clear that the question of whether the employment of the plaintiff poses risks to the health of others is analyzed as a matter of whether the person is "otherwise qualified." Arline, 480 ______ U.S. at 287; see also Abbott v. Bragdon, --- F.3d ---, ---, ___ ____ ______ _______ 1997 WL 85096, at *7 (1st Cir. March 5, 1997) ("A court's goal in conducting a direct threat analysis under the ADA is to achieve a reasonable balance, protecting service providers . . . from enforced exposure to unacceptable health and safety risks" while protecting the disabled from discrimination.).   In Arline, the Court held that the issue of the ______ threat to others posed by an employee with a communicable disease was properly analyzed as a question of whether the employee was "otherwise qualified." Arline, 480 U.S. at 287. ______ The Court noted that a "person who poses a significant risk of communicating an infectious disease to others in the workplace will not be otherwise qualified for his or her job if reasonable accommodation will not eliminate that risk." Id. at 287 n.16. Arguably, in Arline, the question of ___ ______ whether the plaintiff could perform the core functions of a school teacher's job was separate from the question of whether she nonetheless posed a risk because of her communicable disease. Here, the questions are not separate: -21- 21 the issue of risk posed to others arises in the context of a core function of the job. The EEOC correctly points out that, unlike the Rehabilitation Act, the ADA's definition of "qualified individual" does not address risk posed to others. While it is true that the implementing regulations under the Rehabilitation Act define "qualified individual with handicaps" specifically to include "without endangering the health and safety of the individual or others," 29 C.F.R.  1614.203(6), Congress intended the ADA's definition of "qualified individual with a disability" to be "comparable to the definition used in regulations implementing section 501 and section 504 of the Rehabilitation Act of 1973." H.R. Rep. 101-485, pt. 2, at 55, 1990 U.S.C.C.A.N. at 337. The EEOC stakes out a position which is far too broad. This is not a case where a person who can perform all essential job functions nonetheless poses a risk to others. The district court did not, we believe, commit error in considering risk posed to others under the category of "qualification," where the risk is expressly associated with performance of an essential job function. The precise issue here concerns the employer's judgment that Guglielmi could not be trusted to handle the medication-related functions of her job. In this case, a failure to perform an essential function -- overseeing and -22- 22 administering medication -- would necessarily create a risk to others. That a failure to perform a job function correctly creates a risk to others does not preclude the ability to perform that function from being a job qualification. The position argued by the EEOC would lead to the anomalous result that there is a lesser burden of proving qualifications on a plaintiff where the job involves the care of others, and necessarily entails risk to others, than when the job does not. We do not believe Congress intended to weaken the burden on plaintiffs to show they are qualified in such circumstances. In such cases, where the employee is responsible for ensuring the safety of others entrusted to his or her care, other courts, without discussion of the point the EEOC raises, have simply considered the risk question to be part of the "qualified" analysis. See, e.g., Doe v. University of ___ ____ ___ _____________ Maryland Med. Sys. Corp., 50 F.3d 1261, 1265 (4th Cir. 1995); ________________________ Altman v. New York City Health and Hosp. Corp., 903 F. Supp. ______ ____________________________________ 503, 509-10 (S.D.N.Y. 1995); Mauro v. Burgess Med. Ctr., 886 _____ _________________ F. Supp. 1349, 1352-53 (W.D. Mich. 1995).  We hold that, in a Title I ADA case, it is the plaintiff's burden to show that he or she can perform the essential functions of the job, and is therefore "qualified." Where those essential job functions necessarily implicate the safety of others, plaintiff must demonstrate that she can -23- 23 perform those functions in a way that does not endanger others. There may be other cases under Title I where the issue of direct threat is not tied to the issue of essential job functions but is purely a matter of defense, on which the defendant would bear the burden. This case does not raise or resolve issues of the role of "direct threat" provisions under other parts of the ADA, such as the public accommodation title. Cf. Abbott, 1997 WL 85096. For the ___ ______ reasons which follow, we conclude plaintiff's burden was not met. Appropriateness of Summary Judgment ___________________________________ The EEOC argues that a jury question is presented, in any event, as to whether the evidence showed Guglielmi was qualified. This is not, we think, a close question. We set the context. Guglielmi did not meet her burden of demonstrating that she is qualified. There is in this record no suggestion that the employer has applied its standards differentially. The EEOC presents no evidence that the employer has ever found a similarly situated employee to be qualified to handle the essential medication function. Instead, the EEOC attempts to derive from its disagreement with Amego over whether Guglielmi is qualified an inference that the employer's different assessment is based on disability discrimination. However, where, as here, no evidence of animus is present, courts may give reasonable -24- 24 deference to the employer's assessment of what the position demands. See Doe v. New York Univ., 666 F.2d 761, 776 (2d ___ ___ _______________ Cir. 1981)(finding that, in case involving mentally ill applicant to medical school, "considerable judicial deference must be paid to the evaluation made by the institution itself, absent proof that its standards and its application of them serve no purpose other than to deny an education to handicapped persons"); cf. Southeastern Community College, ___ _______________________________ 442 U.S. at 406 (supporting reasonable deference to the decisions made by administrators of federally funded programs so long as no evidence is presented of discriminatory intent with regard to the handicapped person).  The requirement of showing "qualifications" has substance, notwithstanding the frequent leapfrogging of that analysis to get to the pretext issue under McDonnell _________ Douglas.7 In the context of academic tenure cases, this _______ court has been attentive to the need to balance the right of a plaintiff to be free from discrimination against the undesirable result of having the court sit as a "super-tenure committee." See Villanueva v. Wellesley College, 930 F.2d ___ __________ _________________  ____________________ 7. The ADA is interpreted in a manner similar to Title VII, Soileau, 105 F.3d at 16, and courts have frequently invoked _______ the familiar burden-shifting analysis of McDonnell Douglas in _________________ ADA cases. The qualification prong of the prima facie case is frequently met by a showing that the employee satisfied the prerequisites for the position and that she can perform the essential functions of the position held or desired. See ___ 42 U.S.C. 12111(8); 29 C.F.R. 1630.2(m). -25- 25 124, 129 (1st Cir. 1991). Thus, plaintiffs who have been denied tenure must show that their qualifications are at least comparable to those of a "middle group of tenure candidates as to whom both a decision granting tenure and a decision denying tenure could be justified as a reasonable exercise of discretion by the tenure-decision making body." Banerjee v. Board of Trustees, 648 F.2d 61, 63 (1st Cir. ________ __________________ 1981). Aware of the fine balance of competing considerations that preserve academic freedom, this court has noted that "[i]n tenure cases, courts must take special care to preserve the University's autonomy in making lawful tenure decisions." Brown v. Trustees of Boston Univ., 891 F.2d 337, 346 (1st _____ __________________________ Cir. 1989).  Similar care is required here. Where the plaintiff has presented no evidence of discriminatory intent, animus, or even pretext, we think there should be special sensitivity to the danger of the court becoming a super-employment committee. Unlike the academic institutions in the above- cited cases, Amego is a small employer. Its history of employment decisions is neither lengthy nor detailed, making it difficult to assume, without help from plaintiff, that the qualification standards it asserts for Guglielmi are different from those required of other employees. Plaintiff has failed to provide such help. It is in this context that we review the facts. We are also mindful of the Arline ______ -26- 26 factors for assessing whether an employee poses a significant risk to others. Cf. Arline, 480 U.S. at 288.8 ___ ______ It was eminently reasonable for Amego to be concerned about whether Guglielmi could meet her responsibilities, and also reasonable for it to conclude that the risk was too great to run. The employer's judgment here about the risks of future behavior by an employee is based on past behavior and reasonable indicia of future behavior.  First, the nature of the risk was such that it was extremely difficult to guard against. The clients were particularly vulnerable to abuse or neglect. The mechanisms to insure that they were properly treated with regard to their medications, other than having trustworthy staff, were not obvious. Amego had just learned that, despite its normal procedures, four patients at the Fales Road residence were overly medicated and that it could not determine whether any medications were missing. Testing the clients' blood to determine whether they had received the correct dosage level, or indeed the correct drugs, has to be considered an extraordinary step, and not a safeguard which could routinely  ____________________ 8. In determining whether an individual poses significant health and safety risk to others in the contagious disease context, the Arline Court suggested the consideration of the ______ following factors: the nature of the risk; the duration of the risk; the severity of the risk (potential of harm to third parties), and the probabilities the disease will be transmitted and will cause varying degrees of harm. Id. We ___ conduct our analysis of the safety risk Guglielmi poses to Amego clients against this backdrop. -27- 27 be taken. Additionally, the severity of the risk, i.e., the ____ potential harm to third parties, Arline, 480 U.S. at 288, is ______ great. The potential outcomes of administering the wrong medication to a client are obvious and extreme. Second, there were performance issues which enhanced the likelihood that the clients could be harmed unless steps were taken. Amego received complaints, from other staff members, that Guglielmi was unable to focus on her job and was a risk to patients. The situation was serious enough that staff members sent an emissary to management, asking that something be done. The peculiarity of Guglielmi finding the missing medication log at a place which had been searched earlier would reasonably give Amego pause. Amego had reason to fear that Guglielmi would take medications from Amego. When the police came to her apartment on the night of her second suicide attempt, they found pills they believed to be Klonopin. Klonopin is taken by cocaine users, and management suspected the man with whom Guglielmi lived of being a cocaine user and of drugging Amego clients.9  ____________________ 9. Amego did not learn until after it had decided to terminate Guglielmi's employment that Guglielmi had lied to them about whether she suspected Andrade of using cocaine. Because it is unnecessary to the decision, we do not address the issue of whether this after-acquired evidence could, in the context of the ADA, be used for purposes other than as a rationale for terminating her employment, e.g., to buttress ____ the employer's judgment that Guglielmi's untrustworthiness affected her ability to perform an essential job function. -28- 28 Third, other measures had not eliminated the risk of Guglielmi mishandling medication. Amego knew that, despite counselling and medication, Guglielmi had attempted suicide a second time using medication and that she would have access to Prozac at work, one of the drugs used in this second attempt. The EEOC says that Amego should have had greater confidence in Guglielmi because she no longer had a prescription for drugs after the second attempt. There is cold comfort in that: this fact increased the likelihood that Guglielmi would use the drugs available to her at work for a third attempt. Amego also knew that despite its provision of a work schedule accommodation, Guglielmi soon stopped going to the therapy sessions she said she wanted to attend after her first suicide attempt. Amego knew that by concealing her suicide attempts Guglielmi had misled them about the nature of her previous absences from work.  Fourth, when Amego sought reassurance from Guglielmi's health care providers, the responses were not confidence-building. Posever, the social worker, neither responded to the substance of the request for information nor  ____________________ Cf. Mantolete v. Bolger, 767 F.2d 1416, 1424 (9th Cir. ___ _________ ______ 1985)(holding that, in Rehabilitation Act case, later- discovered evidence as to plaintiff's actual medical condition is admissible to rebut plaintiff's prima facie showing of qualification). But cf. McKennon v. Nashville ___ ___ ________ _________ Banner Publ'g Co., 115 S. Ct. 879, 885 (1995) (holding that, __________________ in ADEA cases, after-acquired evidence may not be used to justify discriminatory discharge, though it may be used to limit plaintiff's recovery). -29- 29 signed her name to the checklist. After receiving the checklist, Driscoll telephoned Posever. Posever explicitly declined to give a psychiatric medical opinion. Dr. Levin, the psychopharmacologist, gave a brief response which Amego could reasonably understand to be unresponsive to its concerns and to be based on Guglielmi's own assessment of her ability to do the work. We also credit the deliberative process through which Amego made its decision.10 It sought additional input, including that from Guglielmi's medical advisors, and considered other information before reaching its decision. This deliberative process undercuts any argument that the employer based its decision as to qualifications on stereotypes about disability. There can be no serious claim that Amego, which had considerable experience dealing with mentally handicapped persons and integrating them into the community, acted on the basis of the stereotypes and fears which Congress wished to counteract in the ADA. Also, Amego had earlier made accommodations. It modified Guglielmi's schedule so that she could receive treatment and was supportive of her efforts to deal with her condition. See ___ Soileau, 105 F.3d at 17. _______  ____________________ 10. As the district court noted, the irony is that, if Amego had acted with less deliberation, the employment action would have been taken before the effective date of the ADA. The ADA became effective a few days before Guglielmi's discharge. -30- 30 Amego also operated in a context which added weight to the risks it thought Guglielmi posed. Amego is licensed by two state agencies and is required to take steps to assure the safety of its patients. If a single client had been harmed from misuse of medication, then Amego stood the risk of losing its licenses and its ability to care for any of its clients.11  Under these circumstances, where no evidence of differential treatment, discrimination, or stereotyping is proffered, the employer's judgment is entitled to some weight. The EEOC's "Interpretive Guidance" to its ADA regulations notes that the inquiry into essential functions is not intended to second-guess an employer's business judgment regarding production standards, whether qualitative or quantitative. EEOC, Interpretive Guidance on Title I of ____________________________________  ____________________ 11. In Arline, the Supreme Court noted that deference should ______ be given to the judgments of public health officials as to the analysis of whether an individual is "qualified." Arline, 480 U.S. at 288; cf. Abbott, 1997 WL 85096, at *9 ______ ___ ______ (reasoning that deference of "prima facie force is due public health officials"). No such direct evidence was presented here. But it is noteworthy that Amego was subject to the regulatory requirements of two public agencies. As a condition of receipt of public funds, Amego must be licensed to operate by the Massachusetts Department of Mental Retardation and the Massachusetts Office for Children. One of the requirements for licensure included ensuring the safety and well-being of the clients entrusted to Amego's care.  -31- 31 the Americans with Disabilities Act, app. to 29 C.F.R. pt. ____________________________________ 1630.12 In somewhat similar factual settings, other courts have affirmed summary judgment on the issue of qualification. In Doe v. University of Maryland Medical System Corp., 50 ___ ______________________________________________ F.3d at 1261, the defendant medical center terminated the employment of an HIV-positive doctor. The court affirmed summary judgment on the grounds that the doctor was not an "otherwise qualified" individual because he posed a significant risk to patients that could not be eliminated through reasonable accommodation. Id. at 1266. The court ___ rejected the doctor's argument that the risk of transmission was so infinitesimal that it could not be considered significant. Id. The employer had relied on recommendations ___ from the Center for Disease Control in analyzing whether the doctor's job functions fit the definition of exposure-prone procedures. Id. at 1264. The court expressed its reluctance ___ to substitute its judgment for that of the medical center. Id. at 1266. In Bradley v. University of Texas M.D. Anderson ___ _______ _________________________________ Cancer Center, 3 F.3d 922 (5th Cir. 1993), the Fifth Circuit ______________  ____________________ 12. It is true that the Interpretive Guidance also states that the determination whether someone is qualified "should not be based on speculation that the employee may become unable in the future." Id. This not such a case. Rather, ___ Amego based its determination on Guglielmi's capabilities "at the time of the employment decision," as the Guidance suggests is appropriate. Id. ___ -32- 32 affirmed entry of summary judgment for the employer on a Rehabilitation Act claim with similar facts.  Similarly, the Fourth Circuit in Martinson v. _________ Kinney Shoe Corp., 104 F.3d 683 (4th Cir. 1997), affirmed ______ __________ summary judgment on the ground that an epileptic employee was not qualified to perform an essential job function of his salesperson's job at a retail store, which entailed maintaining store security. See also Kohl v. Woodhaven ___ ____ ____ _________ Learning Ctr., 865 F.2d 930 (8th Cir. 1988) (finding that a _____________ Hepatitis - B carrier patient who displayed aggressive behavior would pose an unreasonable risk of transmitting the disease to other patients and staff); cf. Arline, 480 U.S. at ___ ______ 288.  Reasonable Accommodation ________________________ The EEOC argues that Amego was required to move Guglielmi from the Team Leader position to a Behavior Therapist position as a reasonable accommodation. If the Behavior Therapist position required no responsibility with respect to medication, there would be more force to the EEOC's position. See Hurley-Bardige v. Brown, 900 F. Supp. ___ ______________ _____ 567, 570 (D. Mass. 1995)(finding that there is "no per se rule against transfers as reasonable accommodations"). But the position did entail that responsibility.  Although medication-related duties are not specifically mentioned in the Behavior Therapist job -33- 33 description, the ability to handle, administer, and document medication was inherently part of the Behavior Therapist's function, as listed in Amego's job description, of "implementing individual clinical and educational programs." 13  All Behavior Therapists receive training in the administration of medications. Behavior Therapists accompany clients on frequent off-site trips into the community and must dispense medications to clients at appropriate times without supervision. When no Shift Supervisors or Team Leaders are present, the Behavior Therapists must dispense medications at the residences. Behavior Therapists also accept deliveries of client medications in Amego's facilities. Keys to the medicine cabinet are easily accessible to Behavior Therapists.  There is no material factual dispute; only the legal implications of these facts are in true dispute. Medication-related duties of the Behavior Therapist position are essential, and not marginal, to the position. While the amount of time a Behavior Therapist spends dispensing  ____________________ 13. Evidence of whether a particular function is essential includes, but is not limited to, written job descriptions; the employer's judgment as to which functions are essential; the amount of time spent on the job performing the function; the consequences of not requiring the plaintiff to perform the function; and the work experience of those who are doing or have done similar jobs. 29 C.F.R. 1630.2(n).  -34- 34 medication is not great, the consequences of getting it wrong are quite great indeed.  There was no accommodation that Amego could make to the Behavior Therapist position that would not cause it undue hardship. See 42 U.S.C. 12112(b)(5)(A), 12111(9).14 To ___ retain Guglielmi while eliminating all of Guglielmi's medication-related duties, it would have been necessary to hire another Behavior Therapist to be paired with her to ensure that she would never be left alone with a client who needed medication. Amego might also have needed an additional supervisor to ensure that Guglielmi did not have access to client medications. The expense of hiring these additional staff would be too great for a small nonprofit like Amego to be reasonably expected to bear.15 See Vande ___ _____  ____________________ 14. In determining whether an accommodation would impose an undue hardship under the ADA, the factors to be considered include: the nature and cost of the accommodation; the overall financial resources of the facility; the number of persons employed at the facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility; the overall financial resources of the covered entity; the overall size of the business of a covered entity; the number, type, and location of its facilities; and the type of operations of the covered entity including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility in question to the covered entity. 42 U.S.C. 12111(10)(B). 15. The cost of an additional Behavior Therapist, for example, would be approximately $20,000 (base wages annually with benefits). Given that Amego ended the fiscal years 1992 and 1993 with a deficit, this would require additional funds which Amego does not have.  -35- 35 Zande v. Wisconsin Dep't of Admin., 44 F.3d 538, 542 (7th _____ ___________________________ Cir. 1995)(holding that employer may prove undue hardship by establishing that the costs of the proposed accommodation are excessive in relation either to its benefits or to the employer's financial health or survival). Another possible option, rearranging Guglielmi's assignment to clients so that she was never with a client who required medication, would obviously be difficult since, at the time of Guglielmi's employment, only one client at the Mansfield residence did not take medication. Assigning Guglielmi to that one client would disrupt Amego's crucial one-staff-member-to-two-clients ratio,16 or result in the need for an additional Behavior Therapist. Both options would alter the basic operations of Amego and go beyond the scope of a reasonable accommodation. See Reigel v. Kaiser ___ ______ ______ Found. Health Plan, 859 F. Supp. 963, 973 (E.D. N.C. 1994). __________________ Deploying another Behavior Therapist to Guglielmi's location and shift or changing Guglielmi's clients' programming to ensure that they were on site, near other staff members, whenever they needed to take medication would have an equally disruptive effect on Amego's clients and  ____________________ 16. Altering these staff/client ratios would contravene specific provisions that are included in Amego's funding contracts and the clients' individualized educational or service plans.  -36- 36 staff as well as interfere with Amego's funding requirements.17 See Ricks v. Xerox Corp., 877 F. Supp. 1468, ___ _____ ___________ 1477 (D. Kan. 1995)(holding that the ADA does not require an employer to hire a full-time helper to assist a disabled employee as a reasonable accommodation). In sum, Amego cannot make a reasonable accommodation. To do what the EEOC asks would be to alter the very nature of the Behavior Therapist position. "Such redefinition exceeds reasonable accommodation." Bradley, 3 _______ F.3d at 925.  "Because Of" and the Conduct/Disability Distinction ___________________________________________________ The EEOC argues that it met its burden on causation because, it says, the ADA prohibits adverse employment action that is based on conduct related to a disability to the same extent that it prohibits adverse employment action based on the underlying disability itself. It says that Amego terminated Guglielmi because of her suicide attempts and that the termination was, therefore, "because of" her disability. Even if Amego terminated Guglielmi for misusing medication, rather than for attempting suicide, the EEOC says the termination decision was still "because of" her disability.   ____________________ 17. Amego's philosophy of maximizing community access opportunities is incorporated into its funding contracts and into clients' individualized programs. Amego would have violated those agreements if it were to diminish or artificially restrict community access opportunities for either Guglielmi's or another employee's clients.  -37- 37 To the extent that the EEOC is arguing that conduct connected to a disability always must be considered to be action "because of" a disability, that is too broad a formulation. While one may hypothesize certain conduct which is in fact more closely compelled by the disability (e.g. ____ profanity from Tourette's Syndrome sufferers), this case does not provide the occasion to explore what merit there might be to a more refined formulation of the EEOC's position. The syllogism which the EEOC presents -- Guglielmi was depressed, therefore Guglielmi attempted suicide, therefore any response to the attempted suicide is "because of" her disability -- breaks down. Apart from the evidence that staff believed she was a threat to clients based on her at-work behavior alone, Amego has been clear, for purposes of the summary judgment motion, that it was the manner of the suicide attempts -- use of medications, including prescription medications -- that motivated its decision.18 There is simply no evidence that Guglielmi's depression compelled her to overdose on medications, as opposed to other methods of attempting suicide. At best, EEOC's evidence was that individuals suffering from bulimia and depression sometimes have suicidal thoughts or attempt  ____________________ 18. Amego, through its Safety Committee, determined that Guglielmi could not safely perform any of the eleven responsibilities of the Team Leader position but did not raise this argument on summary judgment.  -38- 38 suicide. In Taub v. Frank, 957 F.2d 8 (1st Cir. 1992), this ____ _____ court held that a plaintiff could not show under the Rehabilitation Act that he was discharged by reason of his handicap, drug addiction, because his heroin addiction was "simply too attenuated when extended to encompass an addiction-related possession of heroin for distribution." Id. at 11. Similarly, in Leary v. Dalton, another ___ _____ ______ Rehabilitation Act case, this court found that where the discharge from employment was for absenteeism resulting from incarceration for driving under the influence, the plaintiff's disability of alcoholism was not the sole reason for his termination. 58 F.3d 748, 752 (1st Cir. 1995).  The facts of this case do not present the disability and conduct connection the EEOC suggests. Accordingly, there was no error in the district court's determination that the EEOC also has not met its burden of showing the job action was "because of" Guglielmi's disability. The entry of summary judgment for Amego, Inc., is affirmed. ________ -39- 39