Dolores GRIEL, Plaintiff,

v.

FRANKLIN MEDICAL CENTER and
William Garrand, Defendants.

No. Civ.A. 9730285–MAP.

United States District Court,
D. Massachusetts.

Nov. 23, 1999.

Mark H. Bluver, Susan E. Zak, Shatz, Schwartz & Fentin, Springfield, MA, for Dolores Griel, plaintiff.

Jay M. Presser, Marylou Fabbo, Skoler, Abbott & Presser, Springfield, MA, for defendants.

## MEMORANDUM REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Docket No. 37)

PONSOR, District Judge.

## I. INTRODUCTION

Before this court is defendants' motion for summary judgment on plaintiff's claims of handicap discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12117, the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Massachusetts anti-discrimination act, MASS.GEN.LAWS ch. 151B.

Defendants argue that summary judgment is appropriate because plaintiff cannot make out a *prima facie* case and, even if she can, there is insufficient evidence to generate a trial-worthy issue as to whether defendants unlawfully discriminated against her. For the reasons stated below, this court will allow the motion with regard to both the federal claims and the state claim under ch. 151B.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). A "genuine" issue is one that reasonably could be resolved in favor of either party, and a "material" fact is one that affects the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50, 106 S.Ct.

2505, 91 L.Ed.2d 202 (1986). If the moving party (here defendants) can show an absence of evidence to support the nonmoving party's claim, the nonmoving party bears the burden of going beyond the pleadings to demonstrate the existence of a genuine issue for trial. *Id.* at 256, 106 S.Ct. 2505. *See also Tardie v. Rehabilitation Hosp. of Rhode Island, et al.,* 168 F.3d 538, 541 (1st Cir.1999).

In reviewing a grant for summary judgment, the court must view all the evidence in the light most favorable to the nonmoving party, "drawing all reasonable inferences in that party's favor." *Thomas v. Eastman Kodak Co.,* 183 F.3d 38, 42 (1st Cir.1999). Nevertheless, summary judgment may be appropriate even in employment discrimination cases where elusive concepts such as motive and intent are at issue "if the nonmoving party rests on 'conclusory allegations, improbable inferences, and unsupported speculation.'" *Wooster v. Abdow Corp.,* No. CIV.A.94-30060–MAP, 1996 WL 131143 at *8 (D.Mass. March 21, 1996) (quoting *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990)). *See also Conward v. Cambridge Sch. Comm.,* 171 F.3d 12, 18 (1st Cir.1999) (refusing, on motion for summary judgment, "to indulge rank speculation or unsupportable hyperbole").

### III. *FACTUAL BACKGROUND*

The relevant material facts, taken in the light most favorable to plaintiff, are as follows. Defendant Franklin Medical Center ("Franklin") is a corporation with its place of business in Greenfield, Massachusetts. Defendant William Garrand resides in Hadley, Massachusetts, and began working at Franklin on January 6, 1996 as the intensive care unit ("ICU") nurse manager. Plaintiff, Dolores Griel, is a registered nurse who lives in Charlemont, Massachusetts.

In July, 1992 Franklin hired Griel to work thirty-two hours per week as a critical care nurse in Franklin's ICU. During her interview with Mary Brown, the then manager of the ICU nurses, Griel revealed that she was a recovering drug addict who previously worked at Mercy Hospital but was terminated for diverting narcotics. Moreover, she revealed that she was presently enrolled in the Massachusetts Nursing Association's ("MNA") Substance Abuse Rehabilitation Program ("SARP")— a five-year program designed to assist nurses who have diverted narcotics.[1]

During her first three years at Franklin, Griel received favorable personnel evaluations and a commendation for her role in preventing the suicide of a patient. On November 2, 1995, however, Griel injured her back when she was lifting a patient. As a result, she had to stop working for approximately one year. During that time, she remained active in SARP and graduated in March, 1996.

Because of her back injury, Griel, under the care of Dr. Michael Sanders, began taking the narcotic Percocet for pain control. She continued taking Percocet even as the time approached for her to return to work. Concerned, she considered the idea, suggested to her by other medical professionals in recovery, of setting up a "safety net" whereby her coworkers would administer narcotics to her patients for her if she felt she needed the help on a particular occasion. Although she decided against the "safety net," the idea itself appeared to have raised enough concern that Deborah Palmeri, the then acting manager of the ICU, asked the ICU staff "to keep an eye" on Griel.

Nevertheless, one year after her back injury, on November 2, 1996, Griel returned to work at Franklin. Upon her return she took part in an orientation aimed at refreshing her procedural skills,

---

**1.** The SARP program required Griel to refrain from using drugs and to attend intensive therapy and support group sessions.

and after two weeks she resumed all of her previous duties as a critical care nurse.

Soon after her return, however, a coworker raised concerns about Griel's nursing practices. During the week of December 29, 1996, Gail Shattuck, an ICU nurse, approached Palmeri with concerns regarding three specific patients. After reviewing the patients' charts, Palmeri had concerns about Griel's assessment of the patients' needs and administration of narcotics. For example, patients under plaintiff's care seemed to receive an excessive amount of narcotics, and narcotics seemed to be the first line of intervention when alternatives were available. Palmeri reviewed six more of Griel's patient charts, "but found nothing dramatic in these." Defendants' Statement of Material Facts at 13, Docket No. 39. After consulting with Karen Moore (Vice President of Patient Care), Mike Saracino (Clinical Director of Pharmacy), and Robert Oldenburg (Employee Assistance Program Director), on January 3, 1996, Griel was suspended for three days with pay pending an investigation.

On January 6, 1996, Franklin hired defendant William Garrand as the nurse manager for Franklin's ICU nurses. On his second day of employment, Palmeri informed him that she had already suspended Griel for alleged poor nursing practices. Palmeri was scheduled to meet with Griel, and Palmeri asked Garrand if he wished to get involved. Since he was going to be taking over the unit, he agreed to review the patient charts. He reviewed the nine patient charts in which Griel medicated patients with morphine. He agreed with Palmeri that three charts raised concerns about Griel's ability to assess properly patients' needs and to administer narcotics. Thus, they recommended as a condition for returning to work, that Griel refrain from dispensing narcotics for three months and submit to random urine testing.

On January 8, 1997, plaintiff agreed to sign a confidential memorandum setting forth these conditions. After signing the memorandum, plaintiff returned to work and informed her coworkers on her shift about the restrictions. In addition, Garrand called a staff meeting and informed Griel's colleagues about the restrictions. By this time, Garrand had "very strong suspicions that [Griel] was diverting [drugs]." Plaintiff's Exhibits, Docket No. 45, Exhibit 8, Garrand Deposition at 74.

On January 10, 1997, soon after returning from her three-day suspension, another incident occurred. Margaret Kelly–House, a nurse's aid working in the ICU, reported seeing plaintiff on her hands and knees in the utility room doorway rummaging through discarded medication bottles. The nurse's aid reported the incident to Garrand on January 15. Garrand contacted Human Resource Director Mike Derose for guidance, and after Derose spoke with Oldenburg, they instructed Garrand to contact Griel and ask her to go for a drug test pursuant to the conditions of her return.

On January 15, Garrand attempted to contact Griel at home because she had called in sick. After about eight attempts within a two-hour period, Garrand became concerned for her physical well-being, having also learned that she had not been to work since the utility closet incident. He contacted the police and asked them if they would check on her and ask her to call the hospital. After the two state troopers found her at home, Griel contacted Garrand and informed him that she was all right. When asked about the utility closet incident, she explained that she was cleaning up broken bottles. He responded by asking her to take a urine test. She complied, and the result was negative.

On March 4, 1997, Franklin lifted Griel's restrictions, and soon after, Garrand confronted her with protocol violations arising during her care of two patients. On or about March 12, 1997, while caring for patient C.W., Lucy Leete, an ICU nurse, reported to Garrand that Griel drew up a

narcotic (Demerol) for C.W., but then asked Leete to administer the drug. Leete reported the incident because Griel's handling of the matter violated a nursing rule against allowing one nurse to administer medications another has drawn up.[2] Garrand disciplined Leete for this violation although the level of discipline was reduced based on Leete's inexperience and forthrightness. Griel, however, initially denied the story, telling Garrand that Leete had asked her to administer the narcotic. But when further questioned, Griel conceded that she drew up the medication and asked Leete to administer it because the patient was lying on her side and the task was physically more convenient for Leete. Moreover, in subsequently reviewing C.W.'s chart Garrand questioned Griel's decision to administer the Demerol in the first place. Although the dosage was technically permitted by the doctor's orders, other shifts were only medicating C.W. with Tylenol. Garrand believed that Griel's assessment of C.W. was similar to the January assessment problems for which she was placed on restrictions.

On or about March 18, 1997, Griel allegedly violated two other nursing protocols while administering four doses of Morphine to a second ICU patient (E.W.). First, she failed to obtain the required cosignature for surplus narcotics that she "wasted."[3] Second, she did not record one of the morphine doses in the medication administration record (MAR), or in her nurse's notes, which allow subsequent shifts to know what medications have been given at what time. At a disciplinary meeting, plaintiff claimed that she asked another nurse to cosign, but the nurse

failed to do so. In addition, Griel explained that she did not document the dosage in MAR because she was busy taking care of a patient, and she had verbally informed the incoming nurse that she had given the dose.

After the disciplinary meeting, Garrand consulted with Derose and Moore. While they remained convinced about the possibility that Griel's failure to comply with nursing protocols resulted from a possible diversion of narcotics, they did not rest their decision regarding Griel on this basis. They did, however, conclude that because of patient safety concerns, termination was the appropriate course of action. Griel was suspended on March 24, 1997 and a disciplinary hearing was held on March 27. On April 3, 1997, citing unacceptable risks to patient safety, Franklin terminated Griel. Griel then brought suit on the ground that the defendants' decision reflected discrimination against her based on her disability, *i.e.*, her status as a recovering drug-dependant person.

## IV. DISCUSSION

### A. *Plaintiff's Burden On Summary Judgment Under The ADA*

Under section 12112 of the ADA and section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), when plaintiff presents only indirect evidence of discrimination,[4] the court must address a motion of summary judgment within the three stage, burden-shifting framework first outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–805, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and further explained and refined in *Texas Dep't of Community*

---

**2.** There are exceptions to this rule in emergencies. The incident here was not an emergency.

**3.** Narcotics are prepackaged and generally there is an excess of medicine in a vial that needs to be "wasted," *i.e.,* poured down the sink. When wasting excess narcotic, nurses are required to have a witness present to confirm by cosigning that the excess was properly wasted prior to the narcotic being

administered. *See* Defendant's Statement of Material Facts at 6, Docket No. 39.

**4.** Plaintiff concedes that she "does not have direct evidence of discrimination," and that her case falls within the *McDonnell Douglas* burden-shifting regime, discussed *infra.* Plaintiff's Memorandum of Law, Docket No. 43 at 8 n. 8.

*Affairs v. Burdine,* 450 U.S. 248, 254–55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506–508, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). "This framework allocates burdens of production and orders the presentation of evidence in disparate treatment cases so as to progressively 'sharpen the inquiry into the elusive factual questions of intentional discrimination.'" *Wooster,* 1996 WL 131143 at *8 (quoting *Burdine,* 450 U.S. at 255 n. 8, 101 S.Ct. 1089).

▉ The three stages can be summarized as follows. *See Thomas,* 183 F.3d at 56. First, plaintiff must establish by a preponderance of the evidence a *prima facie* case that she (1) was a member of the protected class, *i.e.,* disabled within the meaning of the ADA and Rehabilitation Act of 1973, (2) was qualified for the job, *i.e.,* she could perform the essential functions of her job with or without reasonable accommodations, and (3) was terminated from her job in whole or in part because of her disability. *See Katz v. City Metal Co.,* 87 F.3d 26, 30 (1st Cir.1996).

▉ Once plaintiff establishes her *prima facie* case, at the second stage the burden shifts to the employer-defendant to produce a valid, nondiscriminatory reason for her dismissal. *See Thomas,* 183 F.3d at 56. At this stage defendant has only a burden of production, and if sustained the presumption of unlawful discrimination disappears. *Woodman v. Haemonetics Corp.,* 51 F.3d 1087, 1091 (1st Cir.1995).

▉ At the third and final stage of the *McDonnell Douglas* framework, the burden shifts back to plaintiff. Now she has the burden of persuasion to establish by a preponderance of the evidence that the employer's stated reason for her dismissal was a sham, or pretext, and that the real reason was discriminatory. *See Thomas,* 183 F.3d at 56. "At the third stage," the First Circuit Court of Appeals has recently held,

the ultimate burden is on the plaintiff to persuade the trier of fact that she has been treated differently because of her [disability].... This burden is often broken into two separate tasks. The plaintiff must present sufficient evidence to show both that 'the employer's articulated reason for [terminating] plaintiff is [1] a pretext' and [2] that 'the true reason is discriminatory.' ... For expository convenience this court ... has referred to the First Circuit rule as a 'pretext-plus' standard.

*Thomas,* 183 F.3d at 56 (citations omitted).

**B.** *Plaintiff's Burden on Summary Judgment Under State Law*

▉ The courts of this Commonwealth follow the same three-stage *McDonnell Douglas* analysis for claims arising under MASS.GEN.LAWS ch. 151B. *See Wheelock College v. Massachusetts Comm'n Against Discrimination,* 371 Mass. 130, 134–36, 355 N.E.2d 309 (1976). But, plaintiff's burden for avoiding summary judgment is less onerous under ch. 151B because the Supreme Judicial Court identifies Massachusetts as a "pretext only" state. *See Blare v. Husky Injection Molding Systems Boston, Inc.,* 419 Mass. 437, 444–45, 646 N.E.2d 111 (1995). In other words, in order to prevail at the third stage of the burden-shifting regime, plaintiff "must persuade the fact finder by a fair preponderance of the evidence that the defendant's asserted reasons were not the real reasons ... [for plaintiff's discharge.]" *Id.* at 443, 646 N.E.2d 111 (citing *Brunner v. Stone & Webster Eng'g Corp.,* 413 Mass. 698, 700, 603 N.E.2d 206 (1992)). Thus, with respect to summary judgment under ch. 151B, this court must consider "whether there is evidence which generates a genuine dispute of fact on the pretext point." *Wooster v. Abdow Corp.,* 46 Mass.App.Ct. 665, 669, 709 N.E.2d 71 (1999) (citations omitted).

**C.** *Federal Law Claims*

As stated above, to avoid summary judgment on the claims under the ADA and the

Rehabilitation Act, plaintiff must produce enough evidence to raise a triable issue with respect to the three elements of her *prima facie* case. She must provide evidence that (1) she suffers from a "disability," (2) that she was nevertheless qualified for the job, and (3) that Franklin discharged her in whole or in part because of her disability. *Katz*, 87 F.3d at 30. Defendants concede that plaintiff is "disabled," and so the court will not analyze the disability issue in this case. However, defendants argue that summary judgment is appropriate because plaintiff cannot make out the "qualification prong" of her *prima facie* case.

### 1. Qualification Analysis [5]

■ It is well-settled that in an ADA case, plaintiff has the burden of showing she is a "qualified" individual. *See EEOC v. Amego, Inc.*, 110 F.3d 135, 141 (1st Cir.1997).[6] Under the ADA, the qualification prong of the *prima facie* case is met by showing (1) that the employee satisfied the prerequisites for the position such as experience, education, and other job-related requirements, and (2) that she, with or without reasonable accommodation, can perform the essential functions of such position held or desired. *Id.* at 145 n. 7; *see* 42 U.S.C. § 12111(8); 29 C.F.R.

§ 1630.2(m). However, the ADA also says that "the term 'qualification standards' may include a requirement that an individual shall not pose a direct threat to the health and safety of other individuals in the workplace." 42 U.S.C. § 12113(b).[7] Therefore, where the essential job functions "necessarily implicate the safety of others, plaintiff must demonstrate that she can perform those functions in a way that does not endanger others." *Amego*, 110 F.3d at 144.

■ Defendants argue that plaintiff is not qualified because she cannot show that she can perform an essential function of the job—overseeing and administering medications—in a way that does not endanger others. They point to the fact that shortly after the hospital lifted her restriction on administering medications, she violated nursing protocols by asking another nurse to administer a narcotic that she prepared, by not obtaining co-signatures for wasted narcotics, by not recording her narcotic administrations in MAR, and by administering narcotics to a patient for whom all other nurses administered Tylenol. Moreover, defendants argue that these facts are analogous to *EEOC v. Amego, Inc.*, 110 F.3d 135 (1st Cir.1997) where the court held that summary judgment was appropriate when the record sup-

---

5. Since the Supreme Judicial Court has analyzed Mass.Gen.Laws ch. 151B by looking to case law "construing and applying the analogous Federal statute, § 504 of the Rehabilitation Act of 1973," *Cox v. New England Telephone & Telegraph Co.*, 414 Mass. 375, 382, 607 N.E.2d 1035 (1993), and since the parties have not raised as an issue any relevant differences between federal and state analysis of "qualified individual," the following analysis will resolve whether plaintiff can make out her *prima facie* case for both the federal and state law claims.

6. Given the essential similarity of the language used, the courts have consistently recognized that the term "qualified individual with a disability," as defined in 42 U.S.C. § 12111(8), is to be interpreted the same way as the term "otherwise qualified individual with a disability" under the Rehabilitation Act (29 U.S.C. § 794). *See EEOC v. Amego*, 110

F.3d 135 (1st Cir.1997). *See generally*, 146 ALR Fed 1 (annotation on "qualified individual" under ADA).

7. An "otherwise qualified individual" for purposes of the Rehabilitation Act of 1973 "means with respect to employment, an individual with handicaps who, with or without reasonable accommodation, can perform the essential functions of the position in question without endangering the health and safety of the individual or others and who, depending upon the type of appointing authority being used: (i) Meets the experience or education requirements ... of the position in question." 29 C.F.R. § 1614.203(a)(6) (1999). *See, e.g., Mazzarella v. U.S. Postal Service*, 849 F.Supp. 89 (D.Mass.1994) (holding that an employee failed to establish he was "otherwise qualified" under the Rehabilitation Act because his psychological impairment posed a threat to the safety of others).

ported an employer's determination that an employee, who suffered from depression, was unqualified to administer and monitor patients' medication at a residence for severely disabled individuals in light of evidence that the employee made two suicide attempts by medication overdoses. *Id.* at 144–47. As in *Amego,* defendants argue, Franklin's determination that it could not trust Griel to do the medication-related functions of her job was both plausible and supported by undisputed facts; in addition, this court should not second-guess the hospital's judgment in matters of patient safety. *See Amego* 110 F.3d at 147.

On this close question it appears, however, that Griel's situation is distinguishable from plaintiff's situation in *Amego,* and that the record shows sufficient evidence to raise a triable issue as to whether Griel could perform her medication-related job functions without directly threatening others. In determining that plaintiff had failed to prove she was not a "direct threat" to others, the *Amego* court relied on several factors that are absent here. It found, first, that the risk of harm was extremely difficult to guard against because the severely disabled patients were particularly vulnerable to abuse and neglect, and there were no obvious mechanisms to ensure that they were being properly medicated. Here Franklin had mechanisms that ensured patients were being medicated properly such as the notations on the medical charts, the sign out and waste procedures governing narcotic administration, the inputting of data in the computer, and the observations of nurses on other shifts. Second, the *Amego* court noted that other measures had not eliminated the risk that plaintiff had been mishandling medication. For example, plaintiff in *Amego* was obviously not responding to counseling—having attempted suicide—and she failed to complete her therapy sessions despite a modified work schedule. Here, on the other hand, Griel was attending therapy sessions conscientiously, took and passed every drug test that Franklin requested, and attended AA and Nursing Association meetings regularly. Moreover, despite the lapses in protocol, there is no objective evidence that Griel actually compromised the safety of her patients. The evidence of direct threat to patients in this case is so much less than it was in *Amego* that the court cannot rely on it to grant summary judgment.

The weakness of the evidence of record favoring the . defendant on this point is further underscored by the strength of the evidence favoring the plaintiff. For example, plaintiff's experts independently reviewed the medical records of the five patients that raised patient safety concerns for defendants. One expert concluded that she "found no deviation from the accepted standards of nursing care on the part of Dolores Griel, R.N. She documented her patients' needs for pain management, intervened appropriately with the proper medication given in the prescribed dose ranges, and she documented the effects of her interventions. The patients appeared to suffer no ill effects after being in her care." Plaintiff's Exhibits, Docket No. 45, Exhibit 13 at 22–23. A second expert concluded that "it is my opinion that there were no deviations from accepted standards of nursing care on the part of nurse, Dolores Griel, R.N." *Id.* Exhibit 14 at 3.[8] Given this quantum of evidence the court cannot fairly say that no reasonable jury could conclude that plaintiff can perform her job safely, *i.e.,* that she is a "qualified individual." It therefore follows that plaintiff has cleared the first stage of the

---

8. Both experts agreed that although there were no breaches in nursing protocol as far as the administration of narcotics, there were some charting omissions in her narrative nursing notes; however, both also agreed that these mistakes were minor and not uncommon. In fact, Betsy Green reported that Franklin's charting and documentation process "seems to be particularly complicated and therefore would seem to invite charting errors." Plaintiff's Exhibits, Docket No. 45, Exhibit 13A at 13.

*McDonnell Douglas* analysis, and sufficiently established her *prima facie* case.

Before moving to the second portion of the burden-shifting framework, it is worth pausing to address defendant's concern over the status of plaintiff's expert evidence. In their briefs, defendants have moved to strike this evidence. This court disagrees for the following reasons.

■ Under FED.R.CIV.P. 56(e), "expert opinion is admissible and may defeat summary judgment only where it appears that the affiant is competent to give an expert opinion." *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990). Here plaintiff submitted affidavits and two corresponding 26(a)(2)(B) expert reports by Betsy Green, R.N. and Denise Schoen, R.N. Betsy Green is a Massachusetts registered nurse employed as a family nurse practitioner at the Northampton Health Center and the Cooley Dickinson Hospital in Northampton, Massachusetts. She has over fourteen years of experience as an acute care nurse, most of which was spent in a critical care unit similar to the one at Franklin. She also holds a master's degree in nursing. Denise Schoen is a Massachusetts registered nurse, employed as an administrative supervisor, and has over fifteen years experience as an acute care nurse in the ICU/CCU/Telemetry Units at the Cooley Dickinson Hospital in Northampton. Schoen is also a part-time instructor of clinical nursing at Greenfield Community College. Thus, both nurses appear competent to give an expert opinion about whether Griel deviated from accepted standards of nursing care with respect to the five patients at issue in this case.

Moreover, both opinions have a sufficient foundation. "It is fundamental that expert testimony must be predicated on facts legally sufficient to provide a basis for the expert's opinion ... [thus] an expert should not be permitted to give an opinion that is based on conjecture or speculation from an insufficient evidentiary foundation." *Damon v. Sun Co.*, 87 F.3d 1467, 1474 (1st Cir.1996) (internal quotation marks omitted). Here, both experts rendered their opinions by reviewing the medical records of the five patients, including the nurses' progress notes. Moreover, both presented detailed and well-reasoned opinions grounded in this data. Thus, this court finds no reason to strike this evidence from this summary judgment proceeding.

### 2. *McDonnell Douglas* Analysis

■ Since plaintiff can make out her *prima facie* case, the burden now shifts to defendants to articulate a nondiscriminatory reason for terminating Griel. In this case defendant employer has provided such a reason: Griel's continued employment posed an unacceptable risk to patient safety. This reason is legitimate and nondiscriminatory, and adequately supported by the undisputed evidence. The conclusion that the defendants have indisputably offered a legitimate, nondiscriminatory justification for their termination of Griel is in no way inconsistent with the court's conclusion above, that plaintiff has made out a sufficiently supported *prima facie* case, for a least two reasons. First, defendants' burden at this stage is only to *articulate* a plausible justification; this they have certainly done. Concern about patient safety might well justify an employer's decision to terminate a health care provider. Second, the fact that a jury could conclude that plaintiff was a "qualified individual" in the sense that she posed no immediate, objective threat to the health and safety of patients in no way rebuts defendants' contention that their concern about patient safety was sincere and well supported. Certainly the proffered justification is not specious on its face.

Since defendants have provided a legitimate nondiscriminatory reason for their action, the initial presumption of discrimination drops from the case, and the burden now shifts back to plaintiff to prove discrimination. *See Thomas,* 183 F.3d at 61–

62; *see also Hicks*, 509 U.S. at 510–11, 113 S.Ct. 2742. Specifically, plaintiff must "produce evidence to create a genuine issue of fact with respect to two points: [1] whether the employer's articulated [nondiscriminatory] reason for its adverse action was a pretext and [2] whether the real reason was [handicap] discrimination." *Thomas*, 183 F.3d at 62. In other words, plaintiff "must produce evidence to permit a reasonable jury to conclude both that disparate treatment occurred and that the difference in treatment was because of [discrimination]." *Id.* Since this court finds that plaintiff has not produced enough evidence to show pretext, the following discussion will analyze only that prong.

■ The key to showing pretext in a disparate treatment case is comparative evidence. *See McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817 ("Especially relevant to [a showing of pretext] would be evidence that [nonprotected] employees involved in acts against [the employer] of comparable seriousness ... were nevertheless retained or rehired."); *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 62 (1st Cir.1999) ("The [pretext] portion of [plaintiff's] third-stage burden is to produce sufficient evidence to show that she was not evaluated on the same terms as her colleagues, but rather was evaluated more harshly than other nonminority [colleagues]").[9] Here, "[t]he plaintiff has the burden of showing that she was treated differently from similarly situated [nonhandicapped] persons." *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 17 (1st Cir. 1994). She must "identify and relate specific instances where persons similarly situated 'in all relevant respects' were treated differently." *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir.1989). In addition, she must identify these instances "in terms of performance, qualifications and conduct, 'without such differentiating or mitigating circumstances

that would distinguish' their situations." *Stratus Computer*, 40 F.3d at 17 (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992)); *see Rodriguez–Cuervos v. Wal–Mart Stores, Inc.*, 181 F.3d 15, 21 (1st Cir.1999) (summarizing this test for showing pretext).

■ Griel proffers the following evidence to show disparate treatment. First, she claims that while she was placed on a three month restriction for her January documentation errors, others were sent to documentation courses, or were given verbal or written warnings. Second, while her failure to get signatures for narcotic waste led to her dismissal, it was a ground for merely monitoring others for improvement. In fact, plaintiff noted that discovery revealed over 114 errors in the narcotic administration sheets made by others; defendants have produced no evidence that anyone was disciplined or terminated for these mistakes. Third, while plaintiff concedes that her violation of the rule against administering a drug another nurse drew was very serious and in itself a legitimate ground for termination, Franklin only give Leete, the other nurse involved in that March incident, a general reprimand.

In response, defendants make two points. First, Griel's mistakes were not evaluated in isolation, one by one, but together as a pattern. Defendants admit that a nurse may make isolated mistakes such as a failure to obtain a cosign and not be disciplined or at least not disciplined severely. But in Griel's case, she committed three mistakes in March, with two mistakes (failure to obtain a cosign and failure to document morphine administration) occurring on the same shift for the same patient. Moreover, these mistakes, according to defendants, continued a pattern of problems that was viewed in the context of the January incidents. Plaintiff cannot identify any other nurse who committed such a series of mistakes, much less

---

**9.** Plaintiff may also show pretext by proffering evidence that shows the employer had discriminatory practices or policies. *See*

*McDonnell Douglas*, 411 U.S. at 804–805, 93 S.Ct. 1817. However, in this case, plaintiff offers no such evidence.

committed them within a few weeks after having a narcotics restriction lifted. In other words, defendants claim that no evidence exists of another nurse who was *not* a former substance abuser who engaged in a similar pattern of mistakes and was not discharged.

Second, according to defendants, even if Franklin terminated Griel based on the incidents in isolation, her violation in March 1997 of the "you draw, you administer" rule, was by itself serious enough that Franklin would have fired *any* nondisabled similarly situated nurse. Defendants explain that Leete was given only a reprimand because she was a new nurse and came forward immediately. Griel, on the other hand, was an experienced nurse, who first denied the accusation, and who had just come off of restrictions.

Given this pattern of mistakes, defendants are correct that plaintiff proffers insufficient evidence to avoid summary judgment. There is simply no evidence in the record that a nonhandicapped person "similarly situated in all relevant respects" was, or would have been, treated differently. *Dartmouth*, 889 F.2d at 19. In other words, plaintiff provides no evidence that would remotely justify a jury in concluding a nurse who was not a former substance abuser, and who committed a similar pattern of similar mistakes, was not (or would not have been) terminated.

Morever, even if Franklin terminated Griel based solely on her violation of the "you draw, you administer" rule, and not on any pattern of mistakes, she still has not produced sufficient evidence to avoid summary judgment. The evidence is essentially unrebutted that violating this rule is rare and *very* serious. Although plaintiff's experts rebut the seriousness and the rarity of the documentation and cosign problems, they are conspicuously silent about Griel's violation of this rule.[10] Griel's only evidence for disparate treat-

ment on this point is that Leete, a neophyte, was treated differently when she participated at Griel's request in violation of this serious rule. But to use this evidence to raise a genuine issue of material fact, Griel would have to proffer additional evidence to show that she and Leete were similarly situated "in terms of performance, qualifications and conduct, 'without such differentiating or mitigating circumstances that would distinguish' their situations." *Stratus Computer*, 40 F.3d at 17 (citation omitted). In fact, the evidence is clear that Leete and Griel are not similarly situated. As noted, Leete was new and inexperienced, while Griel had been employed at Franklin since 1992, had been a nurse since 1988, had been recently retrained after returning from her back injury, and had been on restrictions for other mishaps. Leete was forthright in her conduct, while Griel equivocated. Thus, Griel's only evidence of disparate treatment is Franklin's treatment of Leete. Despite plaintiff's counsel's hard work and vigorous argument, this evidence is simply not enough for a reasonable jury to find pretext.

Moreover, there is evidence that of all the nurses that Franklin terminated in the past five years, each committed violations of comparable seriousness to Griel's violations. For example, two were fired for falsifying time cards, and one was caught diverting drugs. Plaintiff argues that these violations are different from hers. But all that is required for the comparison is that they are of "comparable seriousness," not that they are the identical violation. *See McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817. Since plaintiff offers no evidence that her violation of the "you draw, you administer" rule was not less serious than the violations used to terminate other nurses, she has not met her burden to show pretext and to avoid summary judgment on her federal claims.

---

10. The only reference is one sentence, where Betsy Green writes that such a violation "would be strictly against hospital policy."

Plaintiff's Exhibits, Docket No. 45, Exhibit 13 at 21.

**D. State Law Claim**

As noted above, MASS.GEN.LAWS ch. 151B differs from the federal approach in that to avoid summary judgment plaintiff need only show "pretext." *See Blare*, 419 Mass. at 444–45, 646 N.E.2d 111. However, with respect to what evidence plaintiff must proffer to demonstrate pretext, the Commonwealth has adopted the federal approach requiring the use of comparative evidence. *Matthews v. Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 129–30, 686 N.E.2d 1303 (1997) ("adopting the approach taken by" *Dartmouth*, and *Smith* whereby plaintiff must identify specific instances where nonhandicapped persons with similar performance, qualifications and conduct were treated differently).

It is true, as plaintiff points out, that the record contains some evidence of comments by defendants regarding plaintiff's prior drug history. For example, Palmeri noted that it was possible that Griel was diverting drugs, and Moore commented about possibly firing Griel before properly investigating the matter. Under Massachusetts law, however, verbal remarks insufficient to provide direct evidence of discrimination will not, by themselves, demonstrate pretext, but assist in doing so only if linked with comparative evidence demonstrating disparate treatment. *See Tardanico v. Aetna Life & Casualty, Co.*, 41 Mass.App.Ct. 443, 450, 671 N.E.2d 510 (1996) (granting summary judgment and holding that "isolated or ambiguous remarks, tending to suggest animus . . . are insufficient standing alone, to prove a defendant's discriminatory intent"); *Finney v. Madico, Inc.*, 42 Mass. App.Ct. 46, 51, 674 N.E.2d 655 (1997) (reversing summary judgment because plaintiff linked nine remarks sounding of bias against female managers to evidence that defendant laid off only female managers). Here, even if these comments suggest bias, plaintiff has not linked them to evidence of disparate treatment. Therefore, since plaintiff has failed to produce enough evidence to show pretext on her federal claims, summary judgment is appropriate with respect to the ch. 151B claim as well. *See Mullin v. Raytheon Co.*, 164 F.3d 696, 699 (1st Cir.1999) (affirming district court's holding that if "plaintiff makes no showing of pretext, then the state and federal analyses collapse into one another and the summary judgment motion is decided according to familiar standards." *Mullin v. Raytheon Co.*, 2 F.Supp.2d 165, 172 (D.Mass.1998)).

## V. CONCLUSION

Plaintiff provided enough evidence to support a *prima facie* case for disability discrimination under federal and state law. Defendants, in turn, provided sufficient evidence to rebut plaintiff's *prima facie* case by providing a legitimate nondiscriminatory reason for her termination, namely, patient safety. To avoid summary judgment, plaintiff had to point to sufficient evidence of record to show that defendants' reason was a sham, *i.e.*, a pretext, by demonstrating that defendants treated other non-disabled but otherwise similar nurses differently. As noted, counsel has been vigorous in presenting the record in the light most favorable to plaintiff, but the evidence is just not there. No genuine issue of material fact exists for a jury to resolve. For the forgoing reasons, defendants' motion for summary judgment is ALLOWED on all counts.

A separate order will issue.