Lane v. Harborside Healthcare          CV-01-050-JD   07/16/02
                    UNITED STATES DISTRICT COURT FOR THE
                         DISTRICT OF NEW HAMPSHIRE


Jano Lane

      v.                                Civil No. 01-050-JD
                                        Opinion No. 2002 DNH 132
Harborside Healthcare-Westwood
Rehab. and Nursing Ctr., and
Harborside N.H. Ltd. Partnership


                              O R D E R

      The plaintiff, Jan "Jano" Lane, brings this action against

her former employer, Harborside New Hampshire Limited

Partnership/Harborside Healthcare - Westwood Rehabilitation and

Nursing Center,[1] alleging that the defendant discharged her in

violation of the Americans with Disabilities Act, 42 U.S.C. §

12111 et seq. ("ADA"), and the Family and Medical Leave Act, 29

U.S.C. § 2601 et seq. ("FMLA").  The defendant moves for summary

judgment on the grounds that Lane has not made out a prima facie

case for either claim.  Lane objects.

_____

      [1]The defendant notes in its motion that Harborside
Healthcare - Westwood Rehabilitation and Nursing Center is a
d/b/a of the Harborside N.H. Limited Partnership.  As such, it
asserts, it is a misnamed party, and it states its intention to
move for misjoinder of a party if the case proceeds to trial.

## Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "'A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party. A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law.'" Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000), quoting Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996).

"'[T]o defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party.'" Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 308 (1st Cir. 2002), quoting LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 842 (1st Cir. 1993) (internal quotation marks omitted). When considering a motion for summary judgment, the court construes the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party."

<u>Feliciano de la Cruz v. El Conquistador Resort & Country Club</u>, 218 F.3d 1, 5 (1st Cir. 2000).

<u>Background</u>

The plaintiff, Jano Lane, was diagnosed with a seizure disorder in 1982, following a head injury she suffered in a fall in 1979. Despite taking three prescription medications per day, Lane experiences approximately four to five grand mal seizures per year. Lane's seizures are frequently triggered by blinking, flashing, flourescent lights, or "strobic" lights, such as those in a movie theater or hospital emergency room. Abrupt changes in heat, humidity, or air pressure can cause a seizure. Because of those triggers, Lane rarely travels by airplane. Stress is a primary cause of her seizures.

Each of Lane's grand mal seizures is actually a series of seizures, each lasting approximately thirty seconds, separated by a period of a few minutes. During a seizure, Lane's body convulses, she sweats, her bladder and bowels empty, and she falls in and out of consciousness and semi-consciousness. During a seizure she cannot think, concentrate, stand, or communicate. Because of her seizure disorder, Lane has lived with a friend, Bonnie Hazelton, for the last ten years. Hazelton provides Lane with transportation to and from work.

3

Lane is forewarned prior to the onset of a seizure by what she describes as an "aura," a period during which she experiences sensory distortion. While in an aura, Lane's vision becomes blurry, sounds become very loud, and she has a distinct taste in her mouth. Lane testifies in her deposition and affidavit that the aura is useful because it allows her to get to a quiet, safe place in which to have a seizure. She also attempts during the aura to find someone to accompany her into the safe place, to monitor her seizure and potentially prevent her from harming herself. The aura provides, on average, twenty minutes of lead time prior to a seizure.

Lane is a licensed practical nurse ("LPN"). She was employed part-time by the defendant, Harborside Healthcare Limited Partnership ("Harborside"), beginning in 1992 at its Westwood Rehabilitation and Nursing Center ("Westwood"), located in Keene, New Hampshire. From 1994 until her discharge in June of 2000, Lane held the position of charge nurse. As a charge nurse, her responsibilities included: "medication administration, treatment of wounds as ordered by doctors, keeping medical records, flow charts, documentation of progress, concerns, problems, evaluation, interventions, etc.[,] [s]upervision of [certified nursing assistants] who are directly responsible for helping residents with ADLs [sic]. Advocate and

4

liaison between residents, family members, physicians, and pharmacists." (Pl. Answer to Interrog. No. 4.) At Westwood, Lane worked eight-hour shifts, 3 p.m. to 11 p.m., three days per week.

When she started working at Westwood, Lane informed the management about her seizure disorder, and she periodically spoke with her coworkers and the certified nursing assistants ("CNAs") she supervised to inform them about her condition. Prior to 1999, Lane affirms, she found her supervisors at Westwood supportive and accommodating, even over a twelve-month period in 1998 during which she experienced thirteen seizures at work.[2] Lane received positive employment evaluations throughout her tenure at Westwood.

In April of 1999, Ann Nunn joined the staff at Westwood as Administrator. Nunn has overall responsibility for the operations and management of Westwood. In July of 1999, Cheryl Boutin joined the staff as Director of Nursing. Lane informed Nunn and Boutin about her condition, and the procedure for handling her seizures that she and her supervisors had developed. Under that procedure, when she began to experience an aura, or

---

[2]Lane testifies that the increase in seizures was a result of changes in her medication. Once her medications were stabilized, the frequency of her seizures decreased and leveled off at three to five per year.

5

any other precursor of a seizure, Lane would immediately notify the CNAs on duty and the Director of Nursing, or other available management. Lane would then go to a quiet safe place, and management would call in a replacement nurse to cover Lane's shift.

On September 17, 1999, Lane experienced a seizure at work. No injuries were reported as a result of the seizure. Following that incident, Nunn and Boutin became concerned that Lane's seizures posed a risk to her and to her patients. According to Nunn, at the time of the September seizure Lane was the only charge nurse on her wing after 6 p.m. during her weekday shifts, and for the duration of her weekend shifts. Although Lane worked with one to three CNAs on her wing during her shifts, a CNA is not a licensed nurse and is not qualified to distribute medication, provide treatment or emergency care, or carry out a physician's orders. Nunn and Boutin were concerned that if Lane had a seizure, she would require a CNA or nurse present with her to prevent her own injury, and another LPN would be needed to cover Lane's responsibilities. Nunn states that the resulting short-staff situation could compromise patient care and create a safety risk.

For those reasons, Nunn and Boutin obtained Lane's consent to contact her physician, to determine if he felt that she could

6

safely continue with the essential functions of her job.  Lane has been treated since 1995 by Peter J. Williamson, M.D., Professor of Medicine and Director of the Dartmouth Epilepsy Program at Dartmouth-Hitchcock Medical Center.  In a letter to Dr. Williamson dated September 27, 1999, Nunn enclosed a copy of Lane's job description and asked whether Lane would be capable of meeting her job's requirements with or without reasonable accommodations, and what type of accommodations, if any, he would recommend for her.[3]  Lane was told not to report to work pending Dr. Williamson's response.[4]  In a letter dated September 28, 1999, Dr. Williamson wrote, "Jan usually has some warning when she is about to have a seizure. . . . I see no medical reason to limit or alter her job duties because of her seizure disorder unless seizures become uncontrolled."  (Lane Aff. Attach. A.)  Dr. Williamson wrote that at the number of four to five seizures per year, her seizure disorder is "fairly well controlled."

On September 29, 1999, Nunn called Lane and informed her that she would be responsible for giving Westwood management sufficient notice prior to a seizure, as soon as she became aware that one was forthcoming.  Lane agreed to give notice as soon as

_____

[3]Lane's job description does not appear in the record.

[4]Lane was ultimately paid for those shifts, although the parties dispute when she was paid.

7

possible.  Lane's agreement to give prompt notice, together with Dr. Williamson's letter, satisfied Nunn that the safety of Westwood's residents would not be jeopardized by Lane returning to work.

Following Lane's return to Westwood after her September seizure, Harborside contends that it received reports from staff members that Lane was having headaches and taking repeated and extended breaks.  A CNA affirms that following one of those breaks, she found Lane to appear disoriented and confused.  Lane testifies in her deposition and affidavit that she never experienced a seizure at work that she did not report.  She states that she frequently experienced headaches at work, as a result of her medications, which sometimes required her to rest for short periods in a quiet, dark room.  She testifies that she always notified a CNA on her floor when she was taking a break.

On May 16, 2000, Lane experienced another seizure at work. At approximately 4:10 p.m., she informed Assistant Director of Nursing Rose Read that she had a headache.  At 5 p.m., Lane asked Read if she could leave at 7 p.m., when another nurse was scheduled to come on duty.  Read asked Lane if she felt able to continue on her shift, and Lane responded that she did.  However, at 5:15 p.m., Lane asked Read to relieve her from duty.  Lane asked Read and Boutin for assistance, and proceeded to an empty

8

staff office.  Lane testifies in her deposition that she requested that Lisa Bean accompany her, because Bean had been present at her seizures on prior occasions.  Lane also states that she preferred Bean to Read, because Read was several months pregnant at the time, and Lane was fearful that Read would not physically be able to assist her if necessary.  Lane also states that she did not want to hurt a pregnant woman.  Despite Lane's request, however, Bean took over Lane's medication cart, and Read attended to Lane.

At approximately 5:25 p.m., Lane's seizure began.  Read called 911, and an ambulance arrived, along with Hazelton.  Lane told the ambulance crew that she did not wish to go to the hospital, and went home with Hazelton.[5]  She later called Karen Gilbert, ARPN, who is the Clinical Coordinator for the Dartmouth Epilepsy Program.  However, she was not required by Dr. Williamson's orders to seek treatment or to contact him after every seizure, and she did not visit the doctor following her May 16 seizure.

Lane reported for her next scheduled shift following the seizure and worked a full day.  She testifies in her deposition

---

[5]Lane testifies that following a seizure, she experiences sensory distortion similar to an aura, and the lights and atmosphere of a hospital emergency room can trigger further seizures.

that Boutin told her that day that the seizure was "past history." When she reported for her next scheduled shift after that, she was called to Boutin's office and informed that she was suspended, with pay, until a meeting could be held with Jordan Crane, a human resources consultant.[6] Boutin told Lane that the purpose of the meeting would be to "work out what would be best for [Lane] and the residents." (Lane Dep. II, pp. 14-16.) Lane testifies that at that time, she felt Boutin was concerned about her and about patient safety.

Lane was called in to Westwood on June 5, 2000, for a meeting with Nunn and Boutin. They asked Lane if she would switch to a daytime shift, when more nurses and management personnel were on duty to cover if she were to have a seizure. Lane refused the daytime shift. She affirms that she turned down the daytime shift because her doctor had advised her that she should keep her routine as regular as possible. She testifies in her deposition that the daytime shift was more stressful than the evening shift, and therefore more likely to trigger her seizure disorder.[7] Lane did not propose an alternative solution to

---

[6]It is not clear from the record whether Crane is an employee of Harborside, and if so, whether she worked at Westwood.

[7]Lane also told Boutin and Nunn that her transportation would be a problem for the daytime shift, although she has since

10

address Boutin's and Nunn's concerns. Lane testifies that she did not realize that her continued employment at Westwood was contingent on finding an alternate employment arrangement.

Following the June 5 meeting, Nunn determined that Lane could not work safely during the evening in the absence of adequate staff supervision and back-up. Because Lane was not amenable to working a daytime shift, Nunn affirms that she believed she had no option but to terminate her employment. Harborside terminated Lane on June 13, 2000, giving Lane's "physical condition" as the reason for her termination. In its answers to Lane's interrogatories, the defendant states that: "[Lane's] seizures had become uncontrollable . . . [and] rendered her unable to perform the essential functions of her job, yet [she] refused to seek additional treatment. . . . [s]uch seizures created a significant potential risk for injury to herself and others. . . . Moreover, . . . other staff . . . had to care for [Lane], which left patients without care and thus at risk." (Def. Answer to Interrog. No. 3.)

Following her termination from Westwood, Lane experienced difficulty in obtaining another job. After seeking employment for more than nine months, Lane was hired in February of 2001 by

_____

testified in her deposition that the change in her routine was her primary opposition to taking on a daytime shift.

11

Langdon Place, a nursing facility located in Keene, New Hampshire. She remains employed there and works a ten and one-half hour shift, 2 p.m. to 12:30 a.m., three days per week. Her position at Langdon Place is charge nurse of the Alzheimer's unit. She has experienced one seizure at work since beginning her employment there.

## Discussion

Harborside moves for summary judgment on Lane's ADA and FMLA claims, on the grounds that Lane has not made out a prima facie case for either claim. Harborside argues that Lane is not disabled and is not a qualified individual within the meaning of the ADA. They also argue that Lane did not work the number of hours necessary to qualify for protection under the FMLA.

### I. Americans with Disabilities Act

Lane brings this action under Title I of the ADA, which prohibits discrimination against a "qualified individual with a disability because of the disability . . . in regard to . . . the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

To prevail on an ADA claim, a plaintiff must prove by a

12

preponderance of the evidence that: "(1) she was 'disabled' within the meaning of the ADA; (2) she was a 'qualified individual,' *i.e.*, that either with or without reasonable accommodation she was able to perform the 'essential functions' of her former position; and (3) her discharge was due, in whole or in part, to her disability." Laurin v. Providence Hosp., 150 F.3d 52, 56 (1st Cir. 1998); E.E.O.C. v. Amego, Inc., 110 F.3d 135, 141 n.2 (1st Cir. 1997). If a plaintiff establishes all three elements of a prima facie case, the burden shifts, and the defendant is "required to articulate a nondiscriminatory reason for its adverse employment action." Laurin, 150 F.3d at 58.

A. Disabled

Harborside argues that Lane has not met the threshold requirement of showing that she is disabled within the meaning of the ADA. For the purpose of the ADA, a "disability" is:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
> (B) a record of such impairment; or
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

A "physical impairment" is defined as: "[a]ny physiological disorder, or condition . . . affecting one or more of the following body systems: neurological, musculoskeletal, special

13

sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; . . . ." 29 C.F.R. § 1630.2(h)(1).[8] The defendants do not dispute that Lane's seizure disorder constitutes a physical impairment.[9]

For a physical impairment to rise to the level of a disability under the ADA, a plaintiff must show that it substantially limits her with respect to a major life activity. See 42 U.S.C. § 12102(2)(A). Major life activities refer to "those activities that are of central importance to daily life." Toyota Mfg., 122 S.Ct. at 691. Examples of major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). In addition, the ability to reproduce and bear children is also a major life activity. See Bragdon v. Abbott, 524 U.S. 624, 638 (1998); Cruz Carillo v. AMR Eagle, Inc., 148 F. Supp. 2d 142, 144 (D.P.R. 2001).

---

[8]Since the parties rely on the Code of Federal Regulations in interpreting the ADA, the court will consider them without deciding whether they are reasonable or what level of deference they require. See Toyota Mfg., Ky., Inc. v. Williams, 122 S.Ct. 681, 689-90 (2002) (citations omitted).

[9]The court notes that while Lane refers to her impairment as "epilepsy" and "epileptic seizure disorder," Harborside refers to it as a "seizure disorder."

14

For an impairment to constitute a disability, it must limit a major life activity substantially.  See Toyota Mfg., 122 S.Ct. at 691 (noting that the word "substantially" suggests "considerable" or "to a  large degree.").  A major life activity is substantially limited if an individual is:

> (i) [u]nable to perform a major life activity that the average person in the general population can perform; or
> (ii) [s]ignificantly restricted as to the condition, manner or duration under which he or she can perform a particular major life activity as compared to . . . the general population . . . ."

29 C.F.R. § 1630.2(j)(1).  In making this determination the court considers several factors, including the nature and severity of the impairment, the duration or expected duration of the impairment, and the actual or expected permanent or long-term impact resulting from the impairment.  29 C.F.R. § 1630.2(j)(2); Toyota Mfg., 122 S.Ct. at 690.

Harborside argues that Lane's seizure disorder does not substantially limit a major life activity and is therefore not a disability.  Harborside also argues that it did not regard Lane as disabled.  Lane responds that she is disabled under all three definitions.  She claims that her physical impairment, epilepsy, substantially limited a major life activity, that she has a record of epilepsy, and that the defendants mistakenly regarded her as having an impairment that substantially limits her ability

15

to perform her essential job functions at Westwood.

        1.    <u>Impairment That Substantially Limits A Major Life Activity</u>

Harborside contends that the only limitation resulting from Lane's seizure disorder is her inability to drive, which does not constitute a major life activity.[10] Lane responds that she is substantially limited in at least two other major life activities. She contends that her seizure disorder substantially limits her ability to reproduce. In addition, it has defined her existence as to what she can and cannot do, thereby substantially limiting numerous major life activities.

The determination of whether an individual is substantially limited in a major life activity is made on a case-by-case basis. The effect the impairment actually has on that individual is considered and not the effect, if any, such an impairment might or could have. <u>See</u> 29 C.F.R. § 1630.2(j); <u>Sutton v. United Air Lines, Inc.</u>, 527 U.S. 471, 482-83 (1999) (noting that determination of disability is based on effect, not name, of diagnosis of impairment); <u>Katz v. City Metal Co., Inc.</u>, 87 F.3d

_____

    [10]Harborside also argues that Lane's physical impairment does not substantially limit the major life activity of working. However, Lane does not rely on the major life activity of working to support her argument that she is disabled within the meaning of the ADA.

26, 32 (1st Cir. 1996). In determining whether a person who suffers from epilepsy is disabled within the meaning of the ADA, the court undertakes a fact-specific determination. See Otting v. J.C. Penney Co., 223 F.3d 704, 710-11 (8th Cir. 2000)(holding that employee who suffered seizures where she could not speak, walk, or see was disabled); cf. E.E.O.C. v. Sara Lee Corp., 237 F.3d 349, 352-53 (4th Cir. 2001) (holding that employee whose seizures had only a mild impact on sleeping, thinking, and caring for herself was not disabled under ADA); Matczak v. Frankford Candy & Chocolate Co., 136 F.3d 933 (3d Cir. 1997) (reversing court's dismissal of suit and holding that in case of epileptic employee who suffered one seizure in thirty years, the question of disability was better left for the jury). The threshold question, therefore, is whether Lane's seizures substantially limited one or more of her major life activities. See Sara Lee, 237 F.3d at 352.

Lane asserts that her ability to reproduce is substantially limited by her seizure disorder, and she submitted an affidavit in support of her contention. However, that portion of her affidavit was stricken in a separate order issued today. Without the statement contained in Lane's affidavit, the record contains no evidence to support Lane's argument. Therefore the court will not consider the effect of Lane's seizure disorder on her ability

17

to reproduce in determining whether she is disabled within the meaning of the ADA. See Perez v. Volvo Car Corp., 247 F.3d 303, 310 (1st Cir. 2001).

Lane also asserts that when she experiences a seizure, she is temporarily totally disabled. She testifies in her depositions and affidavit that when she has a seizure, she can not walk, stand, speak, see, think, control her movements, perform manual tasks, or care for herself, for repeated periods of thirty seconds to two minutes. Lane's seizures also eliminate her ability to control her bladder and bowel. These affected functions constitute major life activities. See 29 C.F.R. § 1630.2(i). It is undisputed that Lane's seizure disorder is permanent. Although Lane's seizures are intermittent, in her case when they occur they last for several minutes and impose severe limitations on her major life activities. Based on the record, Lane has shown sufficient facts that a trialworthy issue exists as to whether her impairment substantially limits a major life activity. See Otting, 223 F.3d at 710-11.

## 2. Regarded as Disabled

Harborside also moves for summary judgment on the ground that Lane has not shown it regarded her as disabled within the meaning of the ADA. An employee is "regarded as" disabled within

18

the meaning of the ADA if the employer mistakenly believes that the employee is substantially limited in one or more major life activities, either by an impairment that the employee does not have, or by an impairment that the employee actually does have, but that does not substantially limit a major life activity. Murphy v. United Parcel Serv., Inc., 527 U.S. 516, 521-22 (1999); Katz, 87 F.3d at 32; see also 42 U.S.C. § 12102(2)(C); 29 C.F.R. § 1630.2(l)(1).

Lane asserts that her seizure disorder constitutes an actual disability under the ADA but argues that the Westwood management erroneously perceived her seizure disorder as substantially impairing the major life activity of working, when in fact it did not. See 29 C.F.R. § 1630.2(i) (listing "working" as a major life activity under the ADA). "With respect to the major life activity of working . . . [the] term 'substantially limits' means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes . . . . The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i).

Harborside admits that it asked Lane to switch to a day time shift because Westwood management believed that she could not perform her essential job functions, specifically ensuring

19

resident safety, while on duty during her existing shifts. However, Harborside's willingness to offer Lane a shift change shows that to the extent it perceived Lane as disabled, it did not regard her as totally unable to perform her essential job functions. Lane has not shown facts that Harborside regarded her as unable to perform all LPN jobs, or even all jobs available in Westwood. Harborside's actions were directed at Lane's ability to perform her LPN job during her specific evening shift. Even more specifically, Harborside was concerned about Lane's impact on resident safety and wing coverage, as opposed to her many other job responsibilities. Lane has not shown a dispute of material fact on this issue.

Lane has shown that Harborside regarded her as disabled as far as her performance on her evening shift is concerned, but even so, the inability to perform a single, particular job does not suffice to qualify as a substantial limitation of the major life activity of working. Absent facts establishing that Harborside perceived Lane's impairment as substantially impairing her ability to participate in a broad class of jobs, Lane has not made out a prima facie case that Harborside regarded her as disabled. To the extent that Lane's ADA claim is based on Harborside's regarding her as disabled under § 12102(1)(C), summary judgment is granted in favor of Harborside.

20

B.    Qualified Individual

Harborside contends that, to the extent she is disabled, Lane has not shown that she is a "qualified" individual, as required by the ADA.  See 42 U.S.C. § 12112(a) and § 12111(8).  A qualified individual with a disability is one who can perform the essential functions of her position, with or without reasonable accommodations from her employer.  See 42 U.S.C. § 12112(a).  "[The] analysis of whether an individual is qualified occurs in two steps:  first, whether the individual can perform the essential functions of her position; and second, if she is unable to perform those essential functions, whether any reasonable accommodation by her employer would allow her to do so."  Phelps v. Optima Health, Inc., 251 F.3d 21, 25 (1st Cir. 2001).

The plaintiff bears the burden of showing that she can perform the essential functions of her job.  See Amego, 110 F.3d at 144.  Furthermore, where a plaintiff's essential job functions "necessarily implicate the safety of others, plaintiff must demonstrate that she can perform those functions in a way that does not endanger others."[11]  Id.  Lane does not dispute that

_____

[11]The First Circuit has held that while 42 U.S.C. § 12113(b) provides that a defendant may show a "direct threat to the health

21

maintaining patient safety was an essential function of her job at Westwood.

Harborside asserts that Lane is not qualified for her position, because although she can perform the essential functions of her job, she presents a danger to the Westwood residents in two ways. First, it argues, if Lane were unable to remove herself with sufficient notice prior to a seizure, her physical convulsions during the seizure might injure a resident. Second, since Lane is the only LPN on duty in her wing for at least a portion of each of her shifts, her wing could be short-staffed when she experiences a seizure, compromising patient care.

No evidence appears in the record to suggest that Nunn, Boutin, or any other Westwood management found Lane unable to perform her essential job functions for any reason other than her seizure disorder.[12] Other than bruising herself during one

---

or safety of other individuals in the workplace" as an affirmative defense, where an employee is entrusted with the safety of others in her care, the risk question becomes part of the prima facie "qualified" analysis. See Amego, 110 F.3d at 142-44.

[12]Harborside relies on Amego to support its argument that Lane's seizures endangered residents. See 110 F.3d 135. Amego, however, can be distinguished. In Amego, an employee at a residence for severely disabled individuals was terminated because of her diagnosed depression, following two suicide attempts utilizing prescription medications. Id. at 141. The

seizure, no injuries have been reported at Westwood as a direct or indirect result of Lane's seizures. Lane's job evaluations for 1994-1999 all rate her performance as satisfactory or above, without any discussion of her seizure disorder or its effect on her job performance.[13] The absence of any reference to Lane's seizures in her 1998-99 evaluation, when Lane experienced more than a dozen seizures while at work, implies that the Westwood management did not consider her a threat to residents' safety at that time. The occurrence of Lane's seizures has declined markedly since that year, to four seizures per year. Based on the record, Harborside has not shown undisputed facts that Lane's seizures create a risk of physical harm to residents that prevents her from safely performing her essential job functions.

In addition to the threat of injury to residents, Harborside argues that Lane's seizure-related interruptions during her shifts would create a dangerous staffing shortfall. Although

employee's job required her to administer prescription medications to residents, and the record showed that the employee had performance issues that enhanced the likelihood of harming residents. Id. at 146. The defendant's concern in Amego was that the employee would administer incorrect medications to residents, and take medications from the facility. Id. In this case, Harborside has not argued that Lane's actual performance of her essential job functions, or a failure to perform, would endanger residents.

[13]The record does not include Lane's performance evaluation for the year 1999-2000.

Lane's affliction with a seizure during her shift would require the other Westwood staff to do more until coverage arrived, Harborside has not shown that medical assistance and required medications could not be efficiently provided to residents during that window of time. Facts in the record demonstrate that when a nurse falls ill at work, or calls in sick shortly before the start of her shift, Westwood management relieves that nurse of duty and finds another nurse to cover her shift. Nunn affirms that Lane's inability to give warning of an impending seizure more than twenty minutes in advance makes finding coverage more difficult. However, the record does not provide facts to support that contention. Harborside has not shown that Lane's occasional seizures are more detrimental to effective staff coverage than the sudden illness of a non-disabled LPN.

Harborside has not shown undisputed facts to support its contention that Lane's seizure disorder is a danger to patients and that she cannot perform the essential functions of her job, with or without accommodations. Lane has offered sufficient evidence to show that a trialworthy issue exists as to whether she is a qualified individual with a disability, under the ADA.

C.    Reasonable Accommodation

Harborside argues that even if Lane were otherwise qualified for her job, her claim must fail because she rejected Harborside's proposal to switch to a daytime shift.

Where a qualified individual with a disability can not perform the essential functions of her job without accommodations, the ADA requires an employer to provide a reasonable accommodation for that individual's disability, unless doing so would impose an undue hardship on the employer. See 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9(a).

In this case, Lane did not request an accommodation from Harborside. On the contrary, it was Harborside's suggestion that Lane switch to a daytime shift, to eliminate its own concerns about patient safety and nurse coverage. Harborside points out that it believed Lane could safely perform the essential functions of her job with that accommodation, but when Lane rejected that accommodation, Harborside had no choice but to terminate her.

For the reasons discussed above, Harborside has not shown that Lane's performance on the evening shift presented a safety risk to patients. In addition, her doctor did not recommend any accommodations for her to perform. Since Harborside has not shown that Lane required accommodation to perform her essential

25

job function, her unwillingness to switch shifts does not defeat her prima facie ADA case at this stage of the proceedings.

### D.   Discharge

The record shows, and Harborside does not dispute, that Lane was discharged as a result of her physical condition.

## II.  Family Medical Leave Act

Harborside moves for summary judgment on the ground that Lane was not eligible for leave under the FMLA, because she had not worked the requisite hours to qualify for leave under the statute.  In the alternative, Harborside argues that Lane was not entitled to reinstatement under the FMLA because she was unable to perform essential functions of her job.  Lane responds that she was eligible for leave under the FMLA, and that Harborside violated the FMLA by discharging her because she sought leave on May 16, 1999, when she was about to have a seizure.

The FMLA provides that an eligible employee is entitled to total of twelve workweeks of leave during any twelve-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  An employee is eligible under the statute if she has been employed "for at least 1,250

hours of service . . . during the previous [twelve]-month period." 29 U.S.C. § 2611(2)(A)(ii).

In its reply to Lane's objection to summary judgment, Harborside provides what appear to be copies of computer records showing the hours Lane worked at Westwood between May 15, 1999, and May 14, 2000. Harborside asserts that an affidavit from Harborside's human resources coordinator, Sarah Raynes, shows that Lane did not work the requisite 1,250 hours to qualify for protection under the FMLA. However, no affidavit is attached to the reply, and the attached records are not otherwise explained or authenticated. "Documents supporting or opposing summary judgment must be properly authenticated." Carmona v. Toledo, 215 F.3d 124, 131 (1st Cir. 2000), citing Fed. R. Civ. P. 56(e). "To be admissible at the summary judgment stage, 'documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e).'" Carmona, 215 F.3d at 131, quoting Orsi v. Kirkwood, 999 F.2d 86, 92 (4th Cir.1993). Since the records submitted by Harborside are not authenticated or attached to an affidavit, they may not be considered as part of the record for summary judgment. See Fed. R. Civ. P. 56(c), 56(e).

Lane disputes Harborside's calculations of her hours, and affirms that by her personal calculations her hours exceeded the minimum for FMLA coverage. Therefore, the hours worked by Lane

27

in 1999 remain a genuine issue of material fact precluding summary judgment on the FMLA claim.

Harborside argues that even if Lane was eligible for leave under the FMLA, it was not obligated to reinstate her, because she could not perform the essential functions of her job. As discussed above, Harborside has not shown undisputed facts to support its contention that Lane was unable to perform the essential functions of her position. Harborside's motion for summary judgment on Lane's FMLA claim in Count II is denied.

## Conclusion

Harborside's motion for summary judgment (document no. 12) is granted in part, to the extent that Lane's ADA claim relies on Harborside regarding her as disabled under 42 U.S.C. § 12102(2)(C). Harborside's motion for summary judgment is otherwise denied.

In light of these rulings the parties should engage in a good faith effort to resolve this case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
District Judge


July 16, 2002
cc: Francis G. Murphy Jr., Esquire
    William J. Knorr, Esquire
    Jamie N. Hage, Esquire
    Mark H. Burak, Esquire